Matthew M. Boley (8536)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
E-Mail: mboley@ck.law
        jtrousdale@ck.law

*Attorneys for Plaintiff*

Server
Date 2-25-22 Time 2:30pm
P/S
ANDERSON INVESTIGATIONS, INC    #P101391
P.O. BOX 535, SLC, UT 84110    877-619-1110

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| **MOUNTAIN CRANE SERVICE, LLC,** <br><br> Plaintiff, <br><br> vs. <br><br> **HARVEST ENERGY SERVICES, INC.** and **WORKRISE TECHNOLOGIES, INC.,** <br><br> Defendant. | **SUMMONS** <br><br> **Case No. 220901199** <br><br> **Hon. Andrew H. Stone** <br><br> Tier 3 Complaint |

**STATE OF UTAH TO:**     **HARVEST ENERGY SERVICES, INC.**
**c/o COGENCY GLOBAL INC., its registered agent**
**2005 East 2700 South, Suite 200**
**Salt Lake City, Utah 84109**

**YOU ARE HEREBY SUMMONED** and required to file an answer in writing to the enclosed Complaint with the Clerk of the Court of the above-entitled Court at 450 South State Street, Salt Lake City, Utah 84111, and to serve upon, or mail to, Matthew M. Boley and Jeffrey Trousdale of COHNE KINGHORN, P.C., attorneys for the plaintiff, 111 East Broadway, 11th Floor, Salt Lake City, Utah 84111, a copy of said Answer within twenty-one (21) days of the date of service of this Summons upon you. If you fail to do so, judgment by default will be taken against you for the relief demanded in said Complaint, a copy of which is annexed hereto and is herewith served upon you.

{00603374.DOCX /}

DATED this 23rd day of February, 2022.

**COHNE KINGHORN, P.C.**

/s/ Jeffrey Trousdale
Matthew M. Boley
Jeffrey Trousdale
*Attorneys for* MOUNTAIN CRANE SERVICE,
LLC

Matthew M. Boley (8536)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
E-Mail: mboley@ck.law
          jtrousdale@ck.law

*Attorneys for Plaintiff*

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| **MOUNTAIN CRANE SERVICE, LLC**, <br><br> Plaintiff, <br><br> vs. <br><br> **HARVEST ENERGY SERVICES, INC.** and **WORKRISE TECHNOLOGIES, INC.**, <br><br> Defendant. | **COMPLAINT** <br><br> **Case No.** 220901199 <br><br> **Hon.** Andrew H. Stone <br><br> Tier 3 Complaint |

Plaintiff Mountain Crane Service, LLC ("**Mountain Crane**" or "**Plaintiff**") hereby

complains and alleges against Defendant Harvest Energy Services, Inc. ("**Harvest**") and

WorkRise Technologies, Inc. ("**WorkRise**," and together with Harvest, "**Defendants**") as

follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Mountain Crane is a Utah limited liability company with its principal place of

business in Salt Lake County, Utah.

2.      Harvest is a Colorado corporation with its principal place of business in Colorado.

3.      On information and belief, WorkRise is a Delaware corporation with its principal

place of business in Austin, Texas.

4.      Harvest is a wholly-owned subsidiary of WorkRise.

{00602846.DOCX / 2}                                1

5.     Upon information and belief, WorkRise controls some or all of Harvest's operations, including those relevant to this action.

6.     Upon information and belief, WorkRise funds some or all of Harvest's operations.

7.     Harvest operates under the WorkRise name and brand.

8.     Upon information and belief, Harvest utilizes WorkRise's employees in its operations and administration.

9.     Harvest entered into a "Subcontractor Agreement" with Mountain Crane (the **"Subcontractor Agreement"**), a copy of which is attached as **Exhibit 1**, which includes the following provision:

> This Agreement has been made in and shall be governed, interpreted and enforced by the laws of the State of Utah.  MOUNTAIN CRANE and [Harvest] hereby irrevocably submit to the personal and subject matter jurisdiction of any state or federal court sitting in Salt Lake County, State of Utah, in any action or proceeding arising out of or relating to this Agreement.  **Each party acknowledges and agrees that any controversy that may arise under this Agreement, including any exhibits attached to this Agreement, is likely to involve complicated and difficult issues and, therefore, each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect to of any legal action arising out of or relating to this Agreement, or the transactions contemplated hereby.**

10.    Upon information and belief, Defendants regularly conduct business in the State of Utah.

11.    Harvest is registered as a foreign corporation with the State of Utah, and has a registered agent located in the State of Utah.

12.    Defendants regularly communicated with Mountain Crane's officers and employees, who were located in the State of Utah.

13.    On at least one occasion, Defendants met at Mountain Crane's offices in the State of Utah to discuss the Subcontractor Agreement.

14.    Pursuant to Utah Code Ann. § 78B-3-205, including subsections (1), (3), and (5) Defendant is subject to the jurisdiction of the Courts of the State of Utah as to the claims asserted in this action.

15.     Because this Complaint seeks actual damages of at least $300,000, plus attorneys fees and costs of litigation as provided for by contract, this is a "Tier 3" complaint under the Utah Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

**I.      The Agreements**

16.     On or about June 30, 2021, Mountain Crane entered into that certain *Wind Turbine Installation Agreement for Transportation, Offloading, Erection, Cabling and Mechanical Completion, dated June 30, 2021* (the "**Prime Contract**") with Strauss Wind, LLC ("**Owner**").

17.     Under the Prime Contract, Mountain Crane agreed to construct a wind energy generation facility consisting of twenty-nine (29) Units to be located in Santa Barbara County in the State of California ("**Project**" or the "**Facility**") on behalf of Owner.

18.     To fulfill its obligations under the Prime Contract, Mountain Crane sought a qualified, experienced, and capable subcontractor to perform electrical wiring, grout, and tensioning required for the "Wind Turbine Generators" ("**WTGs**" or individually, a "**WTG**") to be completed on the Project.

19.     In or around August, 2021, Mountain Crane and Harvest began negotiating the terms of a possible subcontract for Harvest to perform electrical work on the WTGs.

20.     Mountain Crane primarily communicated with Cody Earle ("**Mr. Earle**"), an employee of Defendants.

21.     Mr. Earle represented that he had the experience and expertise to perform the required wiring work for the WTGs, and that Defendants' team would work under his direction and control.

22.     Mountain Crane relied on Mr. Earle's representations regarding his experience and expertise in entering into negotiations with Defendants.

23.     In an email from Harvest to Mountain Crane sent on August 13, 2021, Harvest committed that "[t]imesheets will be filled out each day and signed as well as the Vestas MyTime app that Vestas requires for technicians to utilize."

24.     In response to the email sent by Harvest on August 13, 2021, Kortney King, ("**Ms. King**") a Mountain Crane employee, confirmed that "[w]e will need your timesheets and will be requesting Vestas sheets. This will ensure billing is mirrored between the two. Please note, we can only clear payment for what vestas sheets have been signed off for."

25.     Consistent with Ms. King's email to Harvest, in oral communications with Harvest, Mountain Crane alerted Harvest that it would be required to submit detailed timesheets and information for any billing on the Project.

26.     On or about October 1, 2021, Mr. Earle sent Harvest's "T&M Proposal to complete Down Tower Wiring and Grout & Tensioning" (the "**Proposal**") to Mountain Crane.

27.     After Harvest sent the Proposal, Mountain Crane and Harvest engaged in further negotiations via email and phone conferences.

28.     In their negotiations, the parties agreed that Harvest would be entitled to charge on a "Time and Materials" [1] basis for a limited duration of time, after which time, Harvest would charge on a "per tower completion" basis.

29.     Harvest requested that Mountain Crane issue a purchase order for the work and materials to be provided on a T&M basis.

30.     On October 4, 2021, Mr. Earle sent an email to Mountain Crane stating that "Mountain Crane will move forward with T&M pricing provided by Harvest for potentially 3 to 4 weeks for 4 technicians with a potential[] start date of 11 October" and requesting that Mountain Crane issue a Purchase Order ("**PO**") for the limited duration during which Harvest would work on a T&M basis.

---

[1] Hereinafter referred to as "**T&M**."

31.     On October 5, 2021, Mountain Crane issued Purchase Order # WDOW-92432 for $345,000, which was for all of the grouting and tensioning materials,[2] mobilization and demobilization, and T&M rates for labor and tooling for four (4) persons for four (4) weeks total.

32.     As reflected in Harvest's invoices for the weeks ending October 9, 2021 – November 12, 2021 (the "**T&M Period**"), Harvest utilized a crew and materials consistent with the PO issued by Mountain Crane.

33.     On or about November 9, 2021, Harvest and Mountain Crane entered into the Subcontractor Agreement.

34.     The Subcontractor Agreement provides that the "total compensation that [Harvest] may bill to MOUNTAIN CRANE for Services will be on a time and materials basis at the rates set forth in **Exhibit 2** or will change to a pre agreed per unit rate of $23,480 per completed WTG Unit, at a time to be agreed by both MOUNTAIN [CRANE] and [Harvest]."

35.     Mr. Earle, on behalf of Harvest, agreed that the T&M period was completed on November 12, 2021, and that Harvest's services would begin on a "per unit rate of $23,480 per completed WTG Unit" beginning on November 13, 2021.

36.     Pursuant to the Subcontractor Agreement, Harvest agreed to provide all services, labor, equipment, and materials necessary for electrically wiring WTGs for the Project and inspecting, assembling, and installing the electrical "Scope of Work" for the WTGs in accordance with the requirements of the Prime Contract, as well as all services labor, equipment, and materials necessary for "grouting" and "tensioning" the WTG Units.

37.     Harvest agreed to comply with the terms of the Subcontractor Agreement and the Scope of Work attached as Exhibit 1 thereto.

38.     Section 2 of the Subcontractor Agreement provides:

**Contractor's Responsibilities and Obligations.**  Contractor shall:

a)      maintain sufficient number of fully-trained technicians and employees to

---

[2] Mr. Earle informed Mountain Crane that Harvest would not be able to purchase the materials needed for the grouting and tensioning for the Project unless Mountain Crane paid for all of the materials (and only the materials) at the beginning of the Project.

perform the Services;

b)      accept and competently and timely perform Services in accordance with the Schedule provided in the Prime Contract, including all attachments, exhibits, addenda, amendments, change orders, documents incorporated by reference in, and appendices thereto (collectively, the "Prime Contract Documents"), notify MOUNTAIN CRANE of the nature of Services performed and complete any reporting requirements requested by MOUNTAIN CRANE;

c)      promptly deliver, furnish, install, and pay for all materials, labor, equipment, tools, appliances and any other items necessary for the complete execution of the Services in accordance with this Agreement and the Prime Contract Documents;

d)      secure and, upon request, provide MOUNTAIN CRANE with a copy of all federal, state and local legal and regulatory documentation, including, but not limited to, permits, hazardous material permits for transportation (including all appropriate placards for their vehicles), assignments, licenses, and approvals necessary and appropriate to perform the Services contemplated by this Agreement;

e)      comply with all applicable MOUNTAIN CRANE and Owner policies, including, but not limited to, those related to (i) safety; (ii) battery handling, transportation, storage and disposal; (iii) MOUNTAIN CRANE's requirement that Contractor's recycling process qualifies for an exemption from liability under the Superfund Recycling Equity Act (42 U.S.C. 9627, et al.); (iv) all immigration, personnel, cleanliness, coordination of work, insurance, and other similar requirements set forth in the Prime Contract;

f)      Contractor will assign a safety representative acceptable to MOUNTAIN CRANE. Such representative may, , perform other duties. Contractor's designated safety representative shall be physically located at the jobsite. Contractor's safety representative shall respond to MOUNTAIN CRANE's and Owner's safety concerns and requirements; have authority for correcting unsafe conditions or acts by Contractor, its employees, and employees of Contractor's suppliers or subcontractors of any tier; and coordinate with other jobsite contractors and subcontractors on safety matters required for the Work. In performance of the Work under this Agreement, Contractor shall establish and maintain a Safety and Health Plan ("Safety and Health Plan") to include, if applicable, tower climbing and general construction policies.   The plan must be submitted to MOUNTAIN CRANE prior to Contractor's commencement of Services. If Contractor does not have a Safety and Health Plan, or if its existing Safety and Health Plan is not acceptable to MOUNTAIN CRANE for any reason, Contractor agrees to adopt the most stringent of MOUNTAIN CRANE's and Owner's safety policies and procedures. Before beginning any work, Contractor shall assure all lower-tier subcontractors adopt in writing, the Contractor's written Safety and Health Plan.

g)    comply with all federal, state and local laws and regulations, including, but not limited to, all federal environmental regulations and standards with respect to the storage, transport, management or other activities associated with the recycling of products, parts and components, including, but not limited to, spent lead-acid batteries, capacitors and circuit boards; and

h)    complete any MOUNTAIN CRANE or Owner form upon request, and follow all MOUNTAIN CRANE service policies, procedures and programs and/or Owner's service policies, procedures and programs, including, but not limited to policies related to employment and background checks, drug testing and the production of a certificate of insurance, as may be implemented and furnished to Contractor by MOUNTAIN CRANE from time to time.

39.    Section 4 of the Subcontractor Agreement provides (with emphasis added):

**Contractor Bound by Terms of Prime Contract.** Contractor agrees to be bound to the Owner and MOUNTAIN CRANE by all terms and conditions, technical and commercial, of the Prime Contract Documents and to conform to, and comply with their provisions and to **assume toward Mountain Crane all the obligations and responsibilities Mountain Crane assumes in and by the Prime Contract Documents toward the Owner** insofar as they are applicable to this Subcontract or Contractor's Services. Furthermore, except as otherwise provided herein or except to the extent that they are inconsistent with the terms set forth herein, MOUNTAIN CRANE agrees to be bound to the Contractor by all the terms and conditions, technical and commercial, of the Prime Contract Documents and to conform to, and comply with their provisions and to assume toward Contractor all the obligations and Responsibilities Owner assumes in and by the Prime Contractor Documents toward MOUNTAIN CRANE insofar as they are applicable to this Subcontract or Contractor's Services. Where any provision of this Subcontract is inconsistent with any provision of the Prime Contract Documents, the more stringent provisions shall govern. Without limitation, Contractor agrees that Contractor shall: (i) not be entitled to any Change Order (*e.g.*, an amendment to the schedule by which the Services must be provided and completed, a change in the contract price, or any other equitable adjustment related to the Services), unless MOUNTAIN CRANE is entitled to and obtains a Change Order from Owner related to or affecting Contractor's Services; (ii) **be bound by any "dispute resolution" provisions in the Prime Contract Documents**; (iii) as applicable to Contractor's Services, acts, omissions, or performance or failure to perform under this Agreement, assume all of the indemnification requirements, responsibilities, and obligations that MOUNTAIN CRANE has assumed towards Owner; (iv) comply with any lien, lien waiver, or other similar such provisions in the Prime Contract Documents; assume all risks assumed by MOUNTAIN CRANE in the Prime Contract Documents, as such risks are applicable to Contractor's Services; and (v) comply with any Force Majeure provisions in the Prime Contract Documents, including the procedures by which to make a claim of Force Majeure.

{00602846.DOCX / 2}       7

40.    Section 16 of the Prime Contract provides:

A dispute may comprise one or more claims. If a dispute exists regarding a claim, the Parties shall endeavor to resolve their dispute through use of the following procedure:

(a) A meeting shall be held between the Parties, attended by individuals from Contractor and Owner with decision-making authority regarding the dispute, to attempt in good faith to negotiate resolution of the dispute.

(b) More than one meeting to negotiate resolution of the dispute may be held. However, if, within sixty (60) days after receipt of the non-claiming Party's decision, the Parties are not successful in resolving the dispute through discussion, then the Parties agree that the dispute may be resolved as provided in Section 18.4 below.

41.    Section 7 of the Subcontractor Agreement provides:

**Compensation to Contractor.** The total compensation that Contractor may bill to MOUNTAIN CRANE for Services will be on a time and materials basis at the rates set forth in **Exhibit 2** or will change to a pre agreed per unit rate of $23,480 per completed WTG Unit, at a time to be agreed by both MOUNTAIN WIND and the Contractor. Invoices must include a detailed breakout of parts and labor. Purchase order numbers, if applicable, must be clearly referenced on Contractor invoices. Contractor shall provide MOUNTAIN CRANE with documentation regarding Services performed and/or parts used in the performance of such Services ("Service Report") as MOUNTAIN CRANE may reasonably request prior to payment by MOUNTAIN CRANE. Notwithstanding anything herein to the contrary, Contractor must provide invoices to MOUNTAIN CRANE with sufficient detail, and in sufficient time, so that MOUNTAIN CRANE may comply with Owner's billing and payment requirements as set forth in the Prime Contract. Contractor invoices shall be paid by MOUNTAIN CRANE on payment terms of net thirty (30) days following the latter of (i) the date of receipt of the invoice and Service Report by MOUNTAIN CRANE or (ii) the date the Owner issues payment to MOUNTAIN CRANE in accordance with the Payment Schedule in the Prime Contract, and such payment relates in part or in whole to Contractor's Services. MOUNTAIN CRANE shall not pay for (i) Services for which no purchase order was issued by MOUNTAIN CRANE, (ii) Services that are not completed by Contractor, (iii) Services performed by unauthorized subcontractors, or (iv) Services for which Owner has not paid MOUNTAIN CRANE. MOUNTAIN CRANE will not be responsible for payment of any invoice submitted more than twenty (20) days after Contractor completes Services, unless Owner pays MOUNTAIN CRANE for such Services, notwithstanding the dilatory invoice(s).

42.    The Subcontractor Agreement provides that Mountain Crane may terminate the

Agreement immediately, for cause, if (among other occurrences): (i) Harvest performs the

{00602846.DOCX / 2}                                8

Services in a manner unacceptable to Mountain Crane; (ii) Harvest experiences a "material change" in its business that affects its current or future obligations under the Agreement; or (iii) Harvest fails to fulfill its responsibilities and obligations set forth in Section 2 of the Agreement.

43.     Section 9 of the Subcontractor Agreement provides in relevant part:

**Indemnification.**     Contractor shall indemnify, release, defend and hold MOUNTAIN CRANE, Owner, and their directors, officers, employees, successors, assigns, customers and agents harmless from and against any and all claims, actions, demands, damages, liabilities, losses, costs or expenses, including reasonable attorney's fees, for (a) injury to or death of any person (including employees and agents of Owner or MOUNTAIN CRANE) and for loss of or damage to any and all property, arising out of or relating to Contractor's performance under this Agreement; or (b) any breach by Contractor of any obligation hereunder, any material misrepresentation or the non-performance of any covenant or obligation under this Agreement; or (c) any claims or actions arising out of, resulting from or connected with a claim of tortious interference and/or improper employment of any of Contractor's employees, including employees or technicians performing work hereunder; or (d) any claims made by Contractor or Technicians for injuries or damages made under worker's compensation or similar laws; or (e) any failure on the part of Contractor to comply with applicable federal, state and local laws, regulations and ordinances. Additionally, Contractor shall assume as to Mountain Crane the same indemnification requirements as Mountain Crane has assumed as to Owner in the Prime Contract Documents.

44.     Section 10 of the Subcontractor Agreement provides:

**Contractor Warranty.**  Contractor warrants as follows:

a)      that it is qualified to do business and is appropriately licensed to perform Services in any location specified in any executed Scope of Work.

b)      that Services improperly or incompletely performed, or parts which fail to perform, will be timely corrected at no cost or expense to MOUNTAIN CRANE or Owner.

c)      that all Services shall be performed by qualified personnel in a professional, timely and workmanlike manner and that Services will be of a quality which conforms to industry standards.

d)      that all Services will be performed in a manner that will comply with all laws, statutes, ordinances, regulations and expressed public policies of the

jurisdictions in which Contractor performs Services and that Contractor shall adhere to the highest ethical standards pertaining to the Services performed.

e)      that, during the 24-month period following the final acceptance of Contractor's Services (the "Warranty Period"), the Contractor's work and Services will (a) conform to technical requirements contained in the exhibits to, and as set forth in, this Agreement and the Prime Contract Documents, (b) be performed with reasonable skill and judgment in accordance with prudent wind power industry practices and (c) be free from defects in installation, assembly and workmanship (for avoidance of doubt, excluding normal wear and tear). Contractor further warrants that any material or equipment included in the Services will be new, unused and of the most suitable grade of its respective kind for its intended purpose. In the event any of the above warranties is breached, Contractor, at the option of MOUNTAIN CRANE and at no cost to MOUNTAIN CRANE,  shall for the Warranty  Period, be obligated at its expense to repair or re-perform any defective work and shall re-perform the necessary services including providing the crew and the equipment required for such repair or re-performance. If Contractor refuses or fails to comply with the provisions of this Article by the earlier of (a) with respect to any emergency or period in which a wind turbine is not operational, two (2) days after such emergency or period and (b) ten (10) days after receiving written notice from MOUNTAIN CRANE detailing such failure, MOUNTAIN CRANE is hereby authorized to take all steps necessary to carry out the same and may charge to Contractor the expense thereof, which MOUNTAIN CRANE shall, acting in good faith, minimize to the fullest extent, and which expense Contractor hereby agrees to pay.

45.    Section 13(c) of the Subcontractor Agreement provides:

Upon termination for cause by MOUNTAIN CRANE, [Harvest] shall immediately cease all Services that [Harvest] had begun to perform unless otherwise indicated in writing by MOUNTAIN CRANE.  Subject to payment by Owner to MOUNTAIN CRANE for the same, [Harvest] shall be paid for any partially performed Services at a rate to be mutually agreed upon by MOUNTAIN CRANE and [Harvest], except that [Harvest] shall reimburse MOUNTAIN CRANE for any costs and expenses incurred by MOUNTAIN CRANE in completion of Services partially performed by Contractor.

46.    **Section 19 of the Subcontractor Agreement provides**:

**Force Majeure.**  Contractor shall comply with the Force Majeure provisions set forth in Article 5 of the Prime Contract, in all respects, as though Contractor is substituted for MOUNTAIN CRANE, and MOUNTAIN CRANE is substituted for Owner in the Prime Contract. For the avoidance of doubt, all obligations assumed by MOUNTAIN CRANE as to Owner in Article 5 of the Prime Contract are assumed by Contractor as to MOUNTAIN CRANE. Contractor shall not obtain any equitable adjustment or price or schedule unless MOUNTAIN CRANE obtains the same from Owner.

## II.    Defendants' Breaches Under the Subcontractor Agreement

47.     Shortly after Harvest commenced work on the Project, Mountain Crane identified problems with Harvest's performance under the Subcontractor Agreement.

48.     On October 18, 2021, Mountain Crane discovered that necessary "Tension Heads" were not on the Project site, notwithstanding Harvest's agreement to provide them in accordance with the Project schedule. Mountain Crane notified Harvest of the problem via email and demanded that the delivery of the Tension Heads be expedited.

49.     On October 21, 2021, Mountain Crane discovered that Harvest had not yet provided required "Grouting Specifications" and an "SDS Sheet" for the materials needed for the WTG Tower base.

50.     Mountain Crane notified Harvest of its lack of performance via email and demanded that the "Grouting Specifications" and "SDS Sheet" be provided immediately.

51.     On October 21, 2021, Travis Horton, a Mountain Crane employee ("**Mr. Horton**") sent an email to Mr. Earle stating as follows (underlining included in original):

> *Good afternoon Cody,*
>
> *I just got word from the Rick Hansen at Strauss that Harvest does not have any representation with respect to experienced Grout Personnel. We have completed setting our 1st Base Section and cannot proceed forward without the Grout Crew. Please know, the Grout is on-site and we just obtained the SDS for the Grout late this morning from Austin.*
>
> *Please expedite the Grout Crew immediately?*
>
> *Next, I have also been informed that your Tension Heads are the incorrect size. Rick Hansen may be able to shed some light on the correct size needed to perform that scope.*
>
> *Jeff and Rick, please feel free to add any detailed additional information that I may be missing.*
>
> *Any questions or additional information needed please utilize this thread to respond.*
>
> *Thank you everyone for working diligently to address these issues.*
>
> *Keep it safe!*

52.     On October 27, 2021 Mountain Crane requested a conference call to "discuss the preparedness of your crew on the [Project]."

53.     During the October 27, 2021 conference call, which occurred the same day, Mountain Crane expressed several additional concerns with Harvest's (lack of) readiness to provide the agreed upon work and services under the PO.

54.     On November 12, 2021, Harvest notified Mountain Crane that it intended to begin wiring "WTG Tower E-02" on Saturday, November 13, 2021.

55.     Harvest, however, failed to provide the tooling certifications required to begin the wiring work on "WTG Tower E-02" on November 13, 2021. Accordingly, Harvest could not perform the work as it had promised.

56.     On November 13, 2021, Robb Hebble ("**Mr. Hebble**"), a Mountain Crane employee, sent an email to certain Harvest employees asking if Harvest had "all necessary Tooling and Manpower on site to facilitate your work scope starting on Monday, going forward?" and asked "[i]s there anything you need from Mountain to ensure [Harvest] is on time & prepared?"

57.     In response to Mr. Hebble's November 13, 2021 email, Harvest acknowledged that it did not have the tooling, certifications, or parts it needed for its scope of work (all of which it was obligated to furnish).

58.     On Monday, November 15, 2021, Harvest was (again) not in a position to begin the work it had promised to begin. That morning, at 9:00 a.m., Jeff Sterett ("**Mr. Sterett**"), Mountain Crane's on-site Project supervisor, sent the following email to certain Harvest employees:

> We need to discuss [the Project] again. I understand not starting the tower wiring due to the yellow jackets this weekend on Saturday. I am not understanding as to why we weren't able to start the Tensioning on Sunday after Grout breaks. I am not happy with this especially when I had two days last week where we had one person on site for morning meeting from Work Rise. If we [ ] as the customer are being charged standby time we have discussed the ability to use these guys for other task at hand and this is not the case if nobody is on site. I have also got feedback on the grout on the second tower poured as not being

*good at E-3. I will get someone to get me pictures and a report back to this email*
*today. I am starting to have concerns and these need to start to be addressed by*
*Work rise immediately. We are going to start to get to tower wiring this week*
*which should keep these guys busy but will start to raise more concerns. To start*
*I have some of the necessary tool certs but not all them to proceed with*
*work. This is starting to concern me as a trend and needs to be addressed again.*

59.     On November 15, 2021, at 12:56 p.m., Mr. Horton sent the following email to

certain Harvest employees:

*Devon, Cody, Andrew, Court*

*Based on what we are seeing the WorkRise  performance needs to be corrected*
*ASAP. Issues at hand.*
- *WorkRise not showing up to POD. WorkRise supervisor must attend all*
  *POD's!*
- *WorkRise crew not showing up for work every work day. If we are paying*
  *standby all employees must be onsite in the morning and check in with*
  *Mountain Site manager or we will not pay standby for that day.*
- *Necessary tooling not onsite. There has been plenty of time to get all*
  *necessary approved tooling onsite this must be rectified ASAP.*
- *Tooling certs not available. We need tooling certs before electrical work can*
  *commence.*
- *First tower toped out Friday 11/12/21 and wiring still not started. 100% of*
  *tooling certs not provided and no crew showed up.*
- *Tower E-3 grouted on Friday 11/12/21 grout brakes came back on 11/13/21*
  *afternoon tensioning did not commence?*

*I have attached a schedule that must be met please make all necessary changes*
*and arrangements to make this happen.[3]*

*We need to have a call tomorrow to discuss what your plan to make corrections*
*and get on track to meet the schedule.*

60.     On December 10, 2021, Mr. Sterett notified Harvest that two of its key personnel,

Austin Cullins ("**Mr. Cullins**") and Devon Desrochers ("**Mr. Derochers**"), were not on the

Project site, and requested a "roll call" of Harvest's personnel onsite. Mountain Crane was

informed that Mr. Cullins was "on rotation," and Harvest confirmed that Mr. Cullins would be

back on the Project site the next day. Mr. Desrochers informed Mountain Crane that he had been

delayed due to travel issues.

---

[3] The referenced schedule was attached to Mr. Horton's email.

61.     Also on December 10, Mr. Deroschers separately sent a series of text messages to

Mr. Hebble. In relevant part, Mr. Deroschers asserted (emphasis added):

> *[Mr. Cullins] should not have a job . . . [t]hat crew that's out there is all [Mr. Cullins'], I let him hire his own guys, Jesse is his main man. I've tried to swap them out for great proven guys [Mr. Cullins] has threatened to quit.*
>
> *Colton [Buskirk] is one of the best in the industry. I wanted Colton out there awhile ago, [Mr. Cullins] threatened to quit if I sent him. So I didn't, [and] let [Mr. Cullins] handle it. . . . The only reason [Mr. Cullins] has a job is cause we were told if [Mr. Cullins] leaves WorkRise is gone. Give me to end of next week and we are not so far up yalls ass you feel us in your throat, **kick us off site**. But don't hold the [Mr. Cullins] thing over me, let Colton run it. . . . **Or just tell me to fuck off and kick us off site.** Cause I'm over [Mr. Cullins]. **And I know Colton was suppose to be out there from the beginning. That's a dumbass decision made internally that all of them regret at this point.***

62.     On December 11, 2021, Mr. Cullins failed to appear at the Project site, and

Mountain Crane subsequently learned that Mr. Cullins voluntarily terminated his employment

with Defendants.

63.     On or about December 11 or 12, 2021, Mountain Crane hosted Harvest at its

offices in Salt Lake City, Utah, to discuss a multitude of issues with Harvest's Work on the

Project (the "**SLC Meeting**"), including Harvest's failure to provide adequate tooling and

personnel to perform the work required under the Subcontractor Agreement.

64.     At the SLC Meeting, Mountain Crane specifically addressed their concerns

regarding the loss of Mr. Cullins, as he appeared to be the only individual employed by

Defendants with the experience needed to complete the Project (though even his performance

was severely lacking).

65.     At the SLC Meeting, Harvest informed Mountain Crane that Mr. Cullins had not,

in fact, left his employment with Harvest, and ensured Mountain Crane that they had adequate

personnel to complete the job.

66.     As of the date of the SLC Meeting, Mr. Cullins had, in fact, left his employment

with Harvest.

67.     Subsequently, in or around the last week of December, 2021, Mountain Crane

learned that Mr. Earle had voluntarily left his employment with Defendants.

68.    Harvest failed to complete the WTG Units in the time set forth in the Project Schedule under the Prime Contract Documents.

69.    As described in more detail in Section IV, below, Harvest failed to properly and competently perform the Work and Services required under the Subcontractor Agreement.

70.    As described in more detail in Section IV, below, Harvest's Work and Services failed to comply with the technical requirements of the Prime Contract Documents.

**III.    Defendants' Billing Problems and Misrepresentations**

71.    Harvest also failed to comply with Mountain Crane's required billing procedures.

72.    Contrary to Harvest's agreement to "include a detailed breakout of parts and labor," including "documentation regarding Services performed and/or parts used in the performance of such Services . . . as Mountain Crane may reasonably request prior to payment by Mountain Crane," Harvest did not provide invoices that included a detailed breakout of parts and labor.

73.    On January 4, 2022, Ms. King, sent an email to Harvest stating as follows:

*Workrise/Harvest Team,*

*We received multiple invoices for the Strauss Project however have not received any signed worksheets for your team onsite that correlated to the invoices received. Please send those my way as soon as possible. I also ask that moving forward those also attached to any invoices sent to our AP team. Let me know if you have any questions or concerns.*

74.    Ms. King's January 4, 2022 email was a reiteration of her requests in the August 13, 2021 emails to Harvest, wherein she stated that Mountain Crane required detailed timesheets for billing purposes.

75.    In response to Mountain Crane's request for detailed worksheets, Harvest sent payroll information, which did not include details of the tasks performed by Harvest's employees or the time spent performing them.

76.    In late January, Harvest submitted multiple timesheets with the additional details

requested by Mountain Crane (the "**Dilatory Timesheets**").

77.     Upon information and belief, the Dilatory Timesheets were not contemporaneously recorded records, but instead were "best guesses" created by Defendants' management to comply with the requirements of the Subcontractor Agreement.

78.     Upon information and belief, the Dilatory Timesheets do not accurately represent the tasks performed by Harvest's employees or the time actually spent performing them.

79.     Harvest did not comply with the requirements of Section 7 of the Subcontractor Agreement.

80.     Because of Harvest's failure to comply with Section 7 of the Subcontractor Agreement, Mountain Crane was unable to "comply with Owner's billing and payment requirements as set forth in the Prime Contract."

81.     Because of Harvest's failure to comply with Section 7 of the Subcontractor Agreement, Mountain Crane was not timely paid by Owner.

**IV.     Termination for Cause and Further Breaches by Defendants**

82.     On or about January 21, 2022, Mountain Crane terminated Harvest "for cause," effective immediately (the "**Termination Date**").

83.     Prior to the Termination Date, Harvest represented to Mountain Crane that it had completed wiring and all other requirements under its Scope of Work for five (5) of the WTG Units (the "**Five Haphazard WTG Units**").

84.     Following the Termination Date, Mountain Crane engaged Sentry Electrical Group, Inc. ("**Sentry**") to inspect the Five Haphazard WTG Units.

85.     Sentry represented to Mountain Crane that the Five Haphazard WTG Units would require a complete "rewiring" due to Harvest's failure to properly wire the Five Haphazard WTG Units.

86.     Harvest failed to properly wire the Five Haphazard WTG Units.

87.      Without limitation, Sentry' corrective work for the Five Haphazard WTG Units includes (or will include) tearing out significant portions of the wiring that Harvest claimed to have completed.

88.      Sentry has quoted to Mountain Crane an estimated cost of $47,800 per WTG Unit to correct and complete the Five Haphazard WTG Units.

89.      In addition to the costs to complete the Five Haphazard WTG Units, Sentry has also quoted Mountain Crane an estimated price of approximately $407,729.16 to complete the remaining Scope of Work (not including the Five Haphazard WTG Units) that Harvest had agreed to complete under the Subcontractor Agreement.

**V.      The Unlawful Stop Payment Notice**

90.      On or about January 26, 2022, Harvest issued a "California Stop Payment Notice" to Owner (the "**Stop Payment Notice**").

91.      The Stop Payment Notice alleges that Mountain Crane owes Harvest the amount of $635,345.00 (the "**Stop Payment Amount**").

92.      The Stop Payment Notice caused Owner to withhold the Stop Payment Amount from payments owed by Owner to Mountain Crane.

93.      By its terms, the Stop Payment Notice was issued pursuant to California Civil Code Sections 8500 – 8510 (the "**Stop Payment Code**").

94.      Section 8508 of the Stop Payment Code provides that a stop payment notice is not valid unless "[t]he claimant gave preliminary notice to the extent required by [Section 8200 of the California Civil Code]."

95.      Section 8200 of the California Civil Code provides in relevant part:

(a) Except as otherwise provided by statute, before recording a lien claim, giving a stop payment notice, or asserting a claim against a payment bond, a claimant shall give preliminary notice to the following persons:
     (1) The owner or reputed owner.
     (2) The direct contractor or reputed direct contractor to which the claimant provides work, either directly or through one or more subcontractors.
     (3) The construction lender or reputed construction lender, if any.

(b) The notice shall comply with the requirements of Chapter 2 (commencing with Section 8100) of Title 1.

(c) Compliance with this section is a necessary prerequisite to the validity of a lien claim or stop payment notice under this title.

(d) Compliance with this section or with Section 8612 is a necessary prerequisite to the validity of a claim against a payment bond under this title.

96.     On information and belief, Harvest did not provide a "preliminary notice" to Owner as required by Section 8200 of the California Civil Code.

97.     Section 8502 of the Stop Payment Code provides (emphasis added):

(a) A stop payment notice shall comply with the requirements of Chapter 2 (commencing with <u>Section 8100</u>) of Title 1, and shall be signed and verified by the claimant.

(b) The notice shall include a general description of work to be provided, and an estimate of the total amount in value of the work to be provided.

(c) The amount claimed in the notice **may include only the amount due the claimant for work provided through the date of the notice**.

98.     The Stop Payment Notice includes claims for invoices with due dates arising after January 26, 2022.

99.     As of January 26, 2022, Owner had not paid Mountain Crane for any of the amounts claimed by Harvest in the Stop Payment Notice.

100.    The Stop Payment Notice includes claims for amounts that were not due under the Subcontractor Agreement, in that Harvest agreed that payment on Harvest's invoices were on "payment terms of net thirty (30) days following the **latter** of (i) the date of receipt of the invoice and Service Report by Mountain Crane or (ii) the **date the Owner issues payment to Mountain Crane** in accordance with the Payment Schedule in the Prime Contract, and such payment relates in part or in whole to [Harvest's] Services."[4]

---

[4] Subcontractor Agreement, § 7 (emphasis added).

101.    The Stop Payment Notice includes claims for amounts that were not due under the Subcontractor Agreement, in that Harvest agreed that Mountain Crane was not obligated to pay for "Services for which Owner has not paid Mountain Crane."[5]

102.    Section 8504 of the Stop Payment Code provides (emphasis added):

> **A claimant that willfully gives a false stop payment notice** or that willfully includes in the notice a demand to withhold for work that has not been provided **forfeits all right to participate in the distribution of the funds withheld** and all right to a lien under Chapter 4

103.    As described in more detail above, the Stop Payment Notice includes demands for Work and Services that were not actually provided or performed.

104.    The Stop Payment Notice is a "false" stop payment notice, in that it is not a valid stop payment notice under Sections 8502 or 8508 of the Stop Payment Code.

105.    Harvest willfully issued the Stop Payment Notice to Owner.

106.    Harvest issued the Stop Payment Notice without first complying with the dispute resolution procedures set forth in Section 4 of the Subcontractor Agreement and Section 16 of the Prime Contract.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

107.    Mountain Crane incorporates the preceding allegations as if set forth herein.

108.    The Subcontractor Agreement is a contract by and between Mountain Crane and Harvest.

109.    Under the Subcontractor Agreement, Harvest agreed to timely complete the Scope of Work attached to the Subcontractor Agreement at a cost of $23,480 per WTG Unit, beginning November 13, 2021.

110.    Harvest did not timely complete the Scope of Work at a cost of $23,480 per WTG Unit.

---

[5] Subcontractor Agreement, § 7.

111.  As of January 26, 2022 (the termination date), Harvest had not begun work on 18 of the WTG Units it was contracted to complete.

112.  As more particularly described above, Harvest materially breached Section 2 of Subcontractor Agreement by, among other things and without limitation:

a.  Harvest did not maintain a sufficient number of fully-trained technicians and employees to perform the Services, including but not limited to its failure to retain (or adequately replace) Mr. Earle and Mr. Cullins and its failure to provide personnel with "grouting" experience;[6]

b.  Harvest did not competently and timely perform the Services in accordance with the schedule provided in the Prime Contract Documents, in that it failed to properly complete the Five Haphazard WTG Units and it failed to commence work on the eighteen (18) remaining WTG Units in accordance with the Prime Contract Documents;[7]

c.  Harvest did not complete the reporting requirements requested by Mountain Crane, including its failure to submit detailed "worksheets" on a contemporaneous basis;[8]

d.  Harvest did not promptly deliver, furnish, install, and pay for all materials, labor, equipment, tools, appliances and any other items necessary for the complete execution of the Services in accordance with the Subcontractor Agreement and the Prime Contract Documents;[9]

e.  Harvest did not timely secure and provide to Mountain Crane all permits, assignments, licenses, and approvals necessary and appropriate to perform the Services contemplated by the Subcontractor Agreement;[10]

---

[6] See Subcontractor Agreement, §2(a).
[7] See Subcontractor Agreement, § 2(b).
[8] See Subcontractor Agreement, § 2(b).
[9] See Subcontractor Agreement, § 2(c).
[10] See Subcontractor Agreement, § 2(d).

       f.      Harvest did not complete any Mountain Crane form upon request, and did not follow all Mountain Crane service policies, procedures and programs and/or Owner's service policies, procedures and programs, including but not limited to Mountain Crane's policies regarding timesheets and billing;[11]

113.    Pursuant to Section 13(b)(x) of the Subcontractor Agreement, Harvest's failure to fulfill its responsibilities and obligations set forth in Section 2 of the Subcontractor Agreement constituted "cause" for immediate termination of the Subcontractor Agreement by Mountain Crane.

114.    As more particularly described above, Harvest failed to perform the Services in a professional, timely, or workmanlike manner (or in a manner acceptable to Mountain Crane), in that Harvest: (i) did competently perform the Services; (ii) did not timely perform the Services; (iii) did not complete the Services in a manner acceptable to Mountain Crane or Owner, in that the WTG Units require substantial rewiring and reconstruction to bring them into compliance with the Prime Contract Documents.

115.    Harvest's failure to perform the Services in a manner acceptable to Mountain Crane constituted "cause" for Mountain Crane immediately to terminate the Subcontractor Agreement under Section 13(b)(vii) of the Subcontractor Agreement.

116.    As more particularly described above, Harvest breached its warranty under Section 10 of the Subcontractor Agreement "that all Services shall be performed by qualified personnel in a professional, timely and workmanlike manner and that Services will be of a quality which conforms to industry standards."

117.    Harvest's failure to utilize and retain qualified personnel was cause for termination of the Subcontractor Agreement under Section 13(b)(viii), which provides that "any

---

[11] See Subcontractor Agreement, § 2(e).

material change in Contractor's business affecting Contractor's current or future obligations under this Agreement" is cause for immediate termination.

118.    As described in more detail above, Harvest breached its agreement that Services improperly or incompletely performed, or parts which fail to perform, would be timely corrected by Harvest at no cost or expense to Mountain Crane or Owner.[12]

119.    Harvest agreed to reimburse Mountain Crane for any costs and expenses incurred by Mountain Crane in completion of Services "partially" performed by Harvest.

120.    Harvest agreed to indemnify Mountain Crane "from and against any and all claims, actions, demands, damages, liabilities, losses, costs or expenses, including reasonable attorney's fees. . . for loss of or damage to any and all property, arising out of or relating to [Harvest's] performance under this Agreement."[13]

121.    Without limitation, Harvest's actions have required Mountain Crane to obtain a new subcontractor to repair or replace Harvest's work on the Five Haphazard WTG Units, including tearing out significant portions of the wiring that Harvest claimed to have completed.

122.    Without limitation, Harvest's actions have required Mountain Crane to utilize its own personnel to perform the "grouting" and "tensioning" Work that Mountain Crane hired Harvest to perform.

123.    The estimated cost of hiring Sentry to repair and replace the wiring for the Five Haphazard WTG Units is approximately $47,800 per WTG Unit, totaling $239,000 (the "**Rewiring Costs**").

124.    The estimated cost for hiring Sentry to complete the remaining wiring for WTG Units that Harvest left uncompleted is $407,729.16 (the "**Wiring Completion Costs**").

125.    The estimated cost for utilizing its own personnel, equipment, and materials to perform grouting left uncompleted by Harvest is no less than $7,685.33 per WTG Unit, totaling no less than $138,355.94 (the "**Grouting Completion Costs**").

---

[12] See Subcontractor Agreement, § 10(b)
[13] See Subcontractor Agreement, § 9.

126.    The estimated cost for utilizing its own personnel to perform tensioning left uncompleted by Harvest is no less than $4,295.23 per WTG Unit, totaling no less than $77,314.14 (the "**Tensioning Completion Costs**").

127.    As a direct and proximate result of Defendant's wrongful conduct, Mountain Crane has suffered injury and damages in an amount to be proved at trial, but in no event less than $322,359.24 which represents the sum of the Rewiring Costs, the Wiring Completion Costs, the Grouting Completion Costs, and the Tensioning Completion Costs, less the amount that Mountain Crane agreed to pay Harvest under the Subcontractor Agreement had Harvest successfully completed the Scope of Work. Additionally, Mountain Crane is entitled to an award of attorneys fees, costs, and expenses in an amount to be proved at trial.

128.    WHEREFORE, Mountain Crane has been damaged and is entitled to judgment against Harvest, in an amount to be proved at trial, but in no event less than actual damages of $322,359.24 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees, costs, and expenses.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

129.    Mountain Crane incorporates the preceding allegations as if set forth herein.

130.    An implied covenant of good faith and fair dealing inheres in each of the agreements between Mountain Crane, on the one hand, and Harvest, on the other hand.

131.    An implied covenant of good faith and fair dealing inheres in the Subcontractor Agreement.

132.    Harvest had a duty, without limitation, to refrain from taking any action to impede Mountain Crane's ability to receive the benefits for which it bargained under the Subcontractor Agreement, any other agreements between the parties, and Mountain Crane's Prime Contract with Owner.

133.    Harvest had a further duty, without limitation, to act in a manner consistent with the agreed common purpose of the parties to the Subcontractor Agreement, and with the justified expectations of Mountain Crane.

134.    Among other things, Harvest had a duty not to exercise discretion capriciously or in bad faith.

135.    As more particularly described above, Harvest materially breached its duties of good faith and fair dealing, in that: (i) Harvest submitted the unlawful Stop Payment Notice to Owner; (ii) Harvest manufactured the Dilatory Timesheets knowing that they were inaccurate or were more likely than not to be inaccurate; and (iii) Harvest knowingly utilized unqualified and incompetent personnel for the Project due to internal "politics."

136.    Harvest's material breach of its duties of good faith and fair dealing materially injured and damaged Mountain Crane.

137.    Mountain Crane has suffered, and continues to suffer, both direct and consequential damages as a result of Harvest's breaches of the covenants of good faith and fair dealing.

138.    As a direct and proximate result of Defendant's wrongful conduct, Mountain Crane has suffered injury and damages in an amount to be proved at trial, but in no event less than $322,359.24, which represents the sum of the Rewiring Costs, the Wiring Completion Costs, the Grouting Completion Costs, and the Tensioning Completion Costs, less the amount that Mountain Crane agreed to pay Harvest under the Subcontractor Agreement had Harvest successfully completed the Scope of Work. Additionally, Mountain Crane is entitled to an award of attorneys' fees, costs, and expenses in an amount to be proved at trial.

139.    WHEREFORE, Mountain Crane has been damaged and is entitled to judgment against Harvest, in an amount to be proved at trial, but in no event less than actual damages of $322,359.24 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION

**(Declaratory Relief – Violation of the Stop Payment Code)**

140.    Mountain Crane incorporates the preceding allegations as if set forth herein.

141.    Section 8508 of the Stop Payment Code provides that a stop payment notice is not valid unless "[t]he claimant gave preliminary notice to the extent required by [Section 8200 of the California Civil Code]."

142.    As described in more detail above, Harvest did not provide a "preliminary notice" to Owner as required by Section 8200 of the California Civil Code.

143.    As described in more detail above, Harvest agreed that it was **not** entitled to be paid by Mountain Crane for Harvest's Services unless and until Owner first paid Mountain Crane for Harvest's Services.

144.    As described in more detail above, as of the date of the Stop Payment Notice, Owner had not paid Mountain Crane any amount for Harvest's (dilatory and unsatisfactory) Services.

145.    Harvest issued the Stop Payment Notice without first complying with the dispute resolution procedures set forth in Section 4 of the Subcontractor Agreement and Section 16 of the Prime Contract.

146.    As described in more detail above, Mountain Crane did not owe Harvest any payments as of the date of the Stop Payment Notice.

147.    The Stop Payment Notice violates Section 8502 of the Stop Payment Code.

148.    As described in more detail above, the Stop Payment Notice includes demands for payment for Work and Services that Harvest did not actually perform.

149.    As described in more detail above, the Stop Payment Notice includes demands for payment for Work and Services that Harvest did not satisfactorily or competently perform.

150.    Harvest willfully issued the Stop Payment Notice to Owner.

151.    The Stop Payment Notice violates Section 8504 of the Stop Payment Code.

152.    WHEREFORE, Mountain Crane has been damaged and is entitled to judgment against Harvest declaring that Harvest is in violation of the Stop Payment Code and finding that

Harvest is not entitled to be paid any amounts so claimed pursuant to Section 8504 of the Stop Payment Code.

## FOURTH CAUSE OF ACTION

### (Tortious Interference with Contract)

153.    Mountain Crane incorporates the preceding allegations as if set forth herein.

154.    As described above, Harvest was aware that Mountain Crane was a party to the Prime Contract with Owner.

155.    The Prime Contract is a valid and lawful agreement between Mountain Crane and Owner.

156.    Harvest was aware that the issuance of the unlawful Stop Payment Notice would cause Owner to withhold payment from Mountain Crane to which Mountain Crane was lawfully entitled.

157.    Harvest intentionally and wrongfully issued the Stop Payment Notice to Owner.

158.    Harvest issued the Stop Payment Notice without justification.

159.    Harvest induced Owner to fail and refuse to perform Owner's obligations under the Prime Contract.

160.    Harvest acted with an improper purpose and by an improper means.

161.    As a result of Harvest's interference with Mountain Crane's contractual and business relations with Owner, Mountain Crane has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages, which include, without limitation, the lost time-value of the Stop Payment Amount presently being withheld from Mountain Crane.

162.    Because Harvest's interference with Mountain Crane's contractual and business relations was willful, malicious, and in reckless disregard for the rights of Mountain Crane, Mountain Crane is entitled to an award of punitive damages in an amount to be determined at trial.

163.    WHEREFORE Harvest is liable to Mountain Crane in the amount of Mountain Crane's actual damages and punitive damages, in an amount to be determined at trial, including

lost business and damage to its good will which, on information and belief, constitutes an amount so as to qualify for tier three discovery, plus the lost time-value of the Stop Payment Amount, plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment)

164.    Mountain Crane realleges and incorporates herein by this reference the foregoing paragraphs of the Complaint as if fully set forth herein.

165.    A justifiable controversy exists as to whether Harvest breached its Subcontractor Agreement with Mountain Crane.

166.    The parties' interests are adverse.

167.    Mountain Crane has a legally protected interest in its Subcontractor Agreement with Harvest and seeks to preserve that right through this declaratory judgment.

168.    These issues are ripe for the Court's determination.

169.    Accordingly, Mountain Crane seeks a declaratory judgment from this Court that its Subcontractor Agreement with Harvest is valid and enforceable and that Harvest materially breached the Subcontractor Agreement.

## SIXTH CAUSE OF ACTION

### (Remedy – Alter Ego and/or Respondeat Superior)

170.    Mountain Crane realleges and incorporates herein by this reference the foregoing paragraphs of the Complaint as if fully set forth herein.

171.    Upon information and belief, Harvest is a wholly owned subsidiary of WorkRise.

172.    Upon information and belief, WorkRise funds Harvest's operations in whole or in part.

173.    Upon information and belief, Harvest and WorkRise share offices.

174.    Upon information and belief, the Defendants (Harvest and WorkRise) were, and are, one and the same.

175.    Upon information and belief, the Defendants (Harvest and WorkRise) were operated as a common enterprise.

176.    Upon information and belief, the Defendants (Harvest and WorkRise) commingled their assets, including cash and other property.

177.    Upon information and belief, the Defendants (Harvest and WorkRise) commingled their employees, officers and managers.

178.    Upon information and belief, the Defendants (Harvest and WorkRise) failed to observe corporate formalities.

179.    Upon information and belief, Harvest was not adequately capitalized.

180.    Upon information and belief, assets (including corporate funds) of Harvest were siphoned by and to the WorkRise.

181.    The Defendants (Harvest and WorkRise) had such a unity of interest and ownership that the separate identities of the Defendants (Harvest and WorkRise) do not exist, but the Harvest is, instead, the alter ego of Workrise.

182.    If observed, the corporate form would sanction a fraud, promote injustice, and result in an inequity.

183.    Plaintiff has suffered, and continues to suffer, injuries and hardships arising from and relating to the continued observance of the corporate form.

184.    Therefore, Defendant WorkRise is liable for the wrongful conduct of Defendant Harvest under the theory of "alter ego" or "veil piercing."

185.    In the alternative, on information and belief, Harvest was an agent acting under the direction, supervision, and control of Defendant WorkRise while it was acting subject to the Subcontractor Agreement.

186.    Defendant WorkRise is therefore vicariously liable for the wrongful conduct of Defendant Harvest under the doctrine of *respondeat superior.*

187.    Therefore, Defendant WorkRise is liable for the damages to Mountain Crane described herein.

188.    WHEREFORE, Plaintiff is entitled to a judgment declaring and adjudging: (a) that WorkRise was, and is, the alter ego of Harvest; (b) that WorkRise is liable for all of the debts and obligations of Harvest (including Harvest's liabilities to Mountain Crane); and (c) that the assets of WorkRise shall be, and are, available to satisfy the creditors of Harvest.

WHEREFORE, Mountain Crane prays for relief as follows:

1.  on its first cause of action, for Breach of Contract, for a judgment against Harvest in an amount to be proved at trial, but in no event less than actual damages of $322,359.24 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees and costs;

2.  on its second cause of action, for Breach of the Implied Covenant of Good Faith and Fair Dealing, for a judgment against Harvest in an amount to be proved at trial, but in no event less than actual damages of $322,359.24 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees and costs;

3.  on its third cause of action, for Violation of the Stop Payment Code, judgment against Harvest declaring that Harvest is in violation of the Stop Payment Code and finding that Harvest is not entitled to be paid any amounts so claimed pursuant to Section 8504 of the Stop Payment Code;

4.  on its fourth cause of action, for Tortious Interference with Contract, judgment against Harvest in an amount to be proved at trial, but in no event less than actual damages and punitive damages, including lost business and damage to its good will which, on information and belief, constitutes an amount so as to qualify for tier three discovery, plus the lost time-value of the Stop Payment Amount, plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum;

5.  on its fifth cause of action, for Declaratory Relief, a declaratory judgment from this Court that its Subcontractor Agreement with Harvest is valid and enforceable and that Harvest breached the Subcontractor Agreement;

6.  on its sixth cause of action, for Alter Ego or Respondeat Superior, for a judgment finding that Harvest is the alter ego or agent of WorkRise, and finding WorkRise liable to Mountain Crane for all amounts for which Defendant Harvest is found liable hereunder; and

7.  for such other relief as the Court deems just and equitable.

DATED: February 22, 2022

                                        COHNE KINGHORN, P.C.

                                        /s/ *Jeffrey Trousdale*
                                        Matthew M. Boley
                                        Jeffrey Trousdale
                                        *Attorneys for MOUNTAIN CRANE*
                                        *SERVICE, LLC*

# EXHIBIT 1

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

# SUBCONTRACTOR AGREEMENT

This Subcontractor Agreement ("Agreement") is entered into by and between Mountain Crane Service, LLC, a Utah limited liability company ("MOUNTAIN CRANE"), and Harvest Energy Services, Inc. a Colorado corporation ("Contractor") and is effective as of the date of the last signature below (the "Effective Date"). MOUNTAIN CRANE and Contractor may be referred to herein individually as "Party" or collectively as "Parties" as the context requires.

WHEREAS:

1) MOUNTAIN CRANE has entered into that certain *Wind Turbine Installation Agreement for Transportation, Offloading, Erection, Cabling and Mechanical Completion, dated June 30, 2021* (the "Prime Contract") with Strauss Wind, LLC ("Owner"), by which MOUNTAIN CRANE intends to construct a wind energy generation facility consisting of twenty-eight (28) Units to be located in Santa Barbara County in the State of California ("Project" or the "Facility") on behalf of Owner; and

2) MOUNTAIN CRANE desires to secure qualified contractors to perform work and services for MOUNTAIN CRANE and Owner on the Project in accordance with the requirements, and subject to the terms and conditions, of the Prime Contract; and

3) Contractor has represented to MOUNTAIN CRANE that it has the current expertise, knowledge, staffing, safety training and resources to provide such work, products, or services as are specified in the Scope of Work attached hereto as **Exhibit 1**, transmitted herewith, or subsequently provided by MOUNTAIN CRANE (the "Scope of Work").

NOW THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements set forth herein and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1) **Scope of Agreement.** Contractor agrees to provide and perform the services and work ("Services" or "Work") specified in the Scope of Work, and maintain an adequate number of qualified, fully-trained service technicians and employees with the requisite expertise and knowledge and other resources needed to perform such Services using (a) good, safe and prudent design and construction practices, (b) standards of safety, performance, dependability, efficiency and economy, all as generally recognized by industry members in the United States in connection with the design and construction of wind power generation systems of a similar scope, nature and complexity to the Work as good and proper and used in the industry, and (c) such other practices, methods or acts which, in the exercise of reasonable judgment by those experienced in the industry in light of the facts known at the time the decision was made, would have been expected to accomplish the Work and at a reasonable cost consistent with Applicable Laws, reliability, safety and expedition.

2) **Contractor's Responsibilities and Obligations.** Contractor shall:

   a) maintain sufficient number of fully-trained technicians and employees to perform the Services;

   b) accept and competently and timely perform Services in accordance with the Schedule provided in the Prime Contract, including all attachments, exhibits, addenda, amendments, change orders, documents incorporated by reference in, and appendices thereto (collectively, the "Prime Contract Documents"), notify MOUNTAIN CRANE of the nature of Services performed and complete any reporting requirements requested by MOUNTAIN CRANE;

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

c)   promptly deliver, furnish, install, and pay for all materials, labor, equipment, tools, appliances and any other items necessary for the complete execution of the Services in accordance with this Agreement and the Prime Contract Documents;

d)   secure and, upon request, provide MOUNTAIN CRANE with a copy of all federal, state and local legal and regulatory documentation, including, but not limited to, permits, hazardous material permits for transportation (including all appropriate placards for their vehicles), assignments, licenses, and approvals necessary and appropriate to perform the Services contemplated by this Agreement;

e)   comply with all applicable MOUNTAIN CRANE and Owner policies, including, but not limited to, those related to (i) safety; (ii) battery handling, transportation, storage and disposal; (iii) MOUNTAIN CRANE's requirement that Contractor's recycling process qualifies for an exemption from liability under the Superfund Recycling Equity Act (42 U.S.C. 9627, et al.); (iv) all immigration, personnel, cleanliness, coordination of work, insurance, and other similar requirements set forth in the Prime Contract;

f)   Contractor will assign a safety representative acceptable to MOUNTAIN CRANE. Such representative may, , perform other duties. Contractor's designated safety representative shall be physically located at the jobsite. Contractor's safety representative shall respond to MOUNTAIN CRANE's and Owner's safety concerns and requirements; have authority for correcting unsafe conditions or acts by Contractor, its employees, and employees of Contractor's suppliers or subcontractors of any tier; and coordinate with other jobsite contractors and subcontractors on safety matters required for the Work. In performance of the Work under this Agreement, Contractor shall establish and maintain a Safety and Health Plan ("Safety and Health Plan") to include, if applicable, tower climbing and general construction policies. The plan must be submitted to MOUNTAIN CRANE prior to Contractor's commencement of Services. If Contractor does not have a Safety and Health Plan, or if its existing Safety and Health Plan is not acceptable to MOUNTAIN CRANE for any reason, Contractor agrees to adopt the most stringent of MOUNTAIN CRANE's and Owner's safety policies and procedures. Before beginning any work, Contractor shall assure all lower-tier subcontractors adopt in writing, the Contractor's written Safety and Health Plan.

g)   comply with all federal, state and local laws and regulations, including, but not limited to, all federal environmental regulations and standards with respect to the storage, transport, management or other activities associated with the recycling of products, parts and components, including, but not limited to, spent lead-acid batteries, capacitors and circuit boards; and

h)   complete any MOUNTAIN CRANE or Owner form upon request, and follow all MOUNTAIN CRANE service policies, procedures and programs and/or Owner's service policies, procedures and programs, including, but not limited to policies related to employment and background checks, drug testing and the production of a certificate of insurance, as may be implemented and furnished to Contractor by MOUNTAIN CRANE from time to time.

3)   **Independent Contractor.** Contractor hereby agrees that for purposes of this Agreement it shall be an independent contractor and that this Agreement shall not create an employer/employee, partnership, agency, joint venture or similar relationship between MOUNTAIN CRANE and Contractor and Contractor's employees. MOUNTAIN CRANE shall not be required to withhold any amounts for state or federal income tax or for FICA taxes from sums becoming due to Contractor under this Agreement. Neither Contractor nor Contractor's employees shall be entitled to participate in any plan, arrangement or distribution by MOUNTAIN CRANE pertaining to any pension, stock, bonus, profit sharing or other benefit

extended to MOUNTAIN CRANE's employees. Contractor has no power, express or implied, to bind MOUNTAIN CRANE in any manner or matter. Contractor shall be solely responsible for directing, controlling, supervising, insuring, and compensating its employees, technicians, agents, and subcontractors, provided, however, that Contractor must obtain MOUNTAIN CRANE's express, written approval of any subcontractor that Contractor seeks to utilize prior to such utilization, and such subcontractors must be made subject to the same terms and conditions set forth herein. Contractor shall be free to utilize its time, energy and skill in such manner as it deems advisable to the extent that Contractor is not otherwise obligated under this Agreement.

4)      **Contractor Bound by Terms of Prime Contract.**  Contractor agrees to be bound to the Owner and MOUNTAIN CRANE by all terms and conditions, technical and commercial, of the Prime Contract Documents and to conform to, and comply with their provisions and to assume toward Mountain Crane all the obligations and responsibilities Mountain Crane assumes in and by the Prime Contract Documents toward the Owner insofar as they are applicable to this Subcontract or Contractor's Services. Furthermore, except as otherwise provided herein or except to the extent that they are inconsistent with the terms set forth herein, MOUNTAIN CRANE agrees to be bound to the Contractor by all the terms and conditions, technical and commercial, of the Prime Contract Documents and to conform to, and comply with their provisions and to assume toward Contractor all the obligations and Responsibilities Owner assumes in and by the Prime Contractor Documents toward MOUNTAIN CRANE insofar as they are applicable to this Subcontract or Contractor's Services. Where any provision of this Subcontract is inconsistent with any provision of the Prime Contract Documents, the more stringent provisions shall govern. Without limitation, Contractor agrees that Contractor shall: (i) not be entitled to any Change Order (*e.g.*, an amendment to the schedule by which the Services must be provided and completed, a change in the contract price, or any other equitable adjustment related to the Services), unless MOUNTAIN CRANE is entitled to and obtains a Change Order from Owner related to or affecting Contractor's Services; (ii) be bound by any "dispute resolution" provisions in the Prime Contract Documents; (iii) as applicable to Contractor's Services, acts, omissions, or performance or failure to perform under this Agreement, assume all of the indemnification requirements, responsibilities, and obligations that MOUNTAIN CRANE has assumed towards Owner; (iv) comply with any lien, lien waiver, or other similar such provisions in the Prime Contract Documents; assume all risks assumed by MOUNTAIN CRANE in the Prime Contract Documents, as such risks are applicable to Contractor's Services; and (v) comply with any Force Majeure provisions in the Prime Contract Documents, including the procedures by which to make a claim of Force Majeure.

5)      **Service Inspection; Delays; Remedial Action Plan.** MOUNTAIN CRANE reserves the right to (i) observe Contractor performing Services, (ii) inspect any products on which Contractor has performed Services, (iii) contact Owner to survey and evaluate Services performed by Contractor, and (iv) conduct product, process, quality, facility, and health and safety audits. TIME IS OF THE ESSENCE WITH RESPECT TO CONTRACTOR'S PERFORMANCE UNDER THE AGREEMENT. Contractor agrees to perform the Services in strict accordance with the Schedule provided by MOUNTAIN CRANE or Owner. If MOUNTAIN CRANE or Owner determine that Contractor is not reasonably likely to achieve a "milestone date," "substantial completion date," "mechanical completion date," or any other applicable deadlines set forth in the Prime Contract Documents, then MOUNTAIN CRANE or Owner may notify Contractor of such determination (a "Delay Notice"). Upon receiving a Delay Notice, Contractor must, within the sooner of three (3) business days or one day prior to the deadline set forth in the Prime Contract for MOUNTAIN CRANE, submit a written plan demonstrating to MOUNTAIN CRANE's satisfaction that Contractor has taken, or will take such steps, including the utilization of additional shifts and/or overtime, additional manpower, and additional resources as required by Contractor to ensure that all Milestones will be achieved by their Milestone Dates (such plan a "Remedial Action Plan"). Contractor shall adhere to such Remedial Action Plan in order to regain compliance with the Project Schedule. Contractor shall bear all costs arising from or relating to the development and implementation of the Remedial Action Plan,

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

including any development, implementation and execution costs.

6)    **Site Conditions; Safety.**  In addition to its obligations set forth under Section 2 of this Agreement, Contractor:

      (a)    has been given the opportunity to inspect the Facility and has done so and accepted the conditions thereof or has voluntarily waived its right to do so or hereby assumes knowledge of any condition which would have or could have reasonably been discovered upon such inspection. Contractor assumes any and all risk of loss and/or expense arising out of or relating to the condition of the Facility.

      (b)    shall take any and all reasonable safety precautions pertaining to the Services and shall comply with all applicable laws, ordinances, rules, regulations and orders issued by any public or governmental agency, body or authority, whether federal, state, local or otherwise, including but not limited to, occupational safety and health legislation.

      (c)    shall keep a fully authorized, competent supervisor acceptable to MOUNTAIN CRANE and Owner on the site during the performance of the Services.   Directions and communications to such supervisor from MOUNTAIN CRANE in connection with the Services shall be treated as directions and communications to Contractor.

7)    **Compensation to Contractor.**  The total compensation that Contractor may bill to MOUNTAIN CRANE for Services will be on a time and materials basis at the rates set forth in **Exhibit 2** or will change to a pre agreed per unit rate of $23,480 per completed WTG Unit, at a time to be agreed by both MOUNTAIN WIND and the Contractor.  Invoices must include a detailed breakout of parts and labor. Purchase order numbers, if applicable, must be clearly referenced on Contractor invoices. Contractor shall provide MOUNTAIN CRANE with documentation regarding Services performed and/or parts used in the performance of such Services ("Service Report") as MOUNTAIN CRANE may reasonably request prior to payment by MOUNTAIN CRANE. Notwithstanding anything herein to the contrary, Contractor must provide invoices to MOUNTAIN CRANE with sufficient detail, and in sufficient time, so that MOUNTAIN CRANE may comply with Owner's billing and payment requirements as set forth in the Prime Contract. Contractor invoices shall be paid by MOUNTAIN CRANE on payment terms of net thirty (30) days following the latter of (i) the date of receipt of the invoice and Service Report by MOUNTAIN CRANE or (ii) the date the Owner issues payment to MOUNTAIN CRANE in accordance with the Payment Schedule in the Prime Contract, and such payment relates in part or in whole to Contractor's Services.  MOUNTAIN CRANE shall not pay for (i) Services for which no purchase order was issued by MOUNTAIN CRANE, (ii) Services that are not completed by Contractor, (iii) Services performed by unauthorized subcontractors, or (iv) Services for which Owner has not paid MOUNTAIN CRANE.  MOUNTAIN CRANE will not be responsible for payment of any invoice submitted more than twenty (20) days after Contractor completes Services, unless Owner pays MOUNTAIN CRANE for such Services, notwithstanding the dilatory invoice(s).

8)    **Confidential Information.**  Contractor recognizes that in order to perform its functions under this Agreement, MOUNTAIN CRANE may provide to Contractor, or Contractor may become exposed to certain confidential, proprietary or trade secret information, including, but not limited under this Agreement to, (i) the identity of Owner; (ii) the terms, conditions, prices, price list multipliers, quotations, engineering and technical analyses, sales and purchase transaction communications and negotiations attached to or associated with any contract, existing or proposed, between MOUNTAIN CRANE and Owner; (iii) confidential information of Owner; and (iv) any other confidential, proprietary or trade secret information ("Confidential Information") in written form provided to Contractor during the term of this Agreement.

As a material aspect of this Agreement, for the term of this Agreement and for a period of five (5) years

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

from the termination or expiration of same, Contractor agrees to accept and maintain as confidential and proprietary to MOUNTAIN CRANE and/or Owner all Confidential Information. Contractor agrees to use efforts to protect the Confidential Information that are consistent with the efforts used to protect its own confidential information, but in no event shall Contractor use less than reasonable care, and to use this Confidential Information only for the benefit of MOUNTAIN CRANE and for the purposes of performing under this Agreement. As a further material aspect of this Agreement, Contractor shall affirmatively place the same obligations regarding this Confidential Information on its employees as are assumed by Contractor to MOUNTAIN CRANE. Contractor shall also secure, monitor, and strictly enforce written and executed trade secrets and non-solicitation agreements as well as covenants not to compete with its employees in furtherance of its obligations to protect the Confidential Information. All Confidential Information obtained by Contractor via its performance under this Agreement shall be and remain the sole and exclusive property of MOUNTAIN CRANE.

Confidential Information shall not include any documentation, data or other information that is (i) independently developed in its entirety by Contractor; (ii) rightfully received by Contractor from an unaffiliated third party without restriction and without reach of this Agreement; (iii) approved for release by written authorization of MOUNTAIN CRANE; (iv) made available by MOUNTAIN CRANE to a third party without similar restriction on such third party's rights; and (v) is or becomes publicly known through no wrongful act of Contractor. Nothing in this provision shall be construed as granting or conferring by MOUNTAIN CRANE and/or Owner(s) to Contractor any rights by license or otherwise, expressed or implied, under any patents, patent applications or copyrights. Within a reasonable time after termination or expiration of this Agreement, Contractor shall return all Confidential Information in its possession, including all copies, received from MOUNTAIN CRANE and/or Owner(s) under this Agreement, or certify in writing that all Confidential Information has been destroyed. To the extent that the confidentiality provisions in the Prime Contract Documents are more stringent than those set forth herein, Contractor shall comply with the more stringent requirements therein.

9) **Indemnification.** Contractor shall indemnify, release, defend and hold MOUNTAIN CRANE, Owner, and their directors, officers, employees, successors, assigns, customers and agents harmless from and against any and all claims, actions, demands, damages, liabilities, losses, costs or expenses, including reasonable attorney's fees, for (a) injury to or death of any person (including employees and agents of Owner or MOUNTAIN CRANE) and for loss of or damage to any and all property, arising out of or relating to Contractor's performance under this Agreement; or (b) any breach by Contractor of any obligation hereunder, any material misrepresentation or the non-performance of any covenant or obligation under this Agreement; or (c) any claims or actions arising out of, resulting from or connected with a claim of tortious interference and/or improper employment of any of Contractor's employees, including employees or technicians performing work hereunder; or (d) any claims made by Contractor or Technicians for injuries or damages made under worker's compensation or similar laws; or (e) any failure on the part of Contractor to comply with applicable federal, state and local laws, regulations and ordinances. Additionally, Contractor shall assume as to Mountain Crane the same indemnification requirements as Mountain Crane has assumed as to Owner in the Prime Contract Documents. Contractor's indemnification of MOUNTAIN CRANE shall solely apply to the extent of Contractor's fault.

To the fullest extent permitted by Applicable Laws, MOUNTAIN CRANE shall, defend, indemnify, and hold harmless Contractor and subsidiaries and affiliates of Contractor, and the directors, officers, agents, employees, successors and assigns of each of them (collectively, the "Contractor Indemnified Parties"; each individually "Contractor Indemnified Party") from any and all Damages caused by the negligence or willful misconduct of MOUNTAIN CRANE and arising out of, resulting from or related to this Agreement, including without limitation, any damage or destruction of property or death of or bodily injury to any person, solely to the extent of MOUNTAIN CRANE's fault. For purposes of this Section 9 the term "Owner" shall include the Owner, its employees, subcontractors, agents, affiliates, successors and

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

assigns. This indemnification shall not be limited in any way by any limitation on benefits payable to or for any third party under any applicable Worker's Compensation laws.

10) **Contractor Warranty.** Contractor warrants as follows:

a) that it is qualified to do business and is appropriately licensed to perform Services in any location specified in any executed Scope of Work.

b) that Services improperly or incompletely performed, or parts which fail to perform, will be timely corrected at no cost or expense to MOUNTAIN CRANE or Owner.

c) that all Services shall be performed by qualified personnel in a professional, timely and workmanlike manner and that Services will be of a quality which conforms to industry standards.

d) that all Services will be performed in a manner that will comply with all laws, statutes, ordinances, regulations and expressed public policies of the jurisdictions in which Contractor performs Services and that Contractor shall adhere to the highest ethical standards pertaining to the Services performed.

e) that, during the 24-month period following the final acceptance of Contractor's Services (the "Warranty Period"), the Contractor's work and Services will (a) conform to technical requirements contained in the exhibits to, and as set forth in, this Agreement and the Prime Contract Documents, (b) be performed with reasonable skill and judgment in accordance with prudent wind power industry practices and (c) be free from defects in installation, assembly and workmanship (for avoidance of doubt, excluding normal wear and tear). Contractor further warrants that any material or equipment included in the Services will be new, unused and of the most suitable grade of its respective kind for its intended purpose. In the event any of the above warranties is breached, Contractor, at the option of MOUNTAIN CRANE and at no cost to MOUNTAIN CRANE, shall for the Warranty Period, be obligated at its expense to repair or re-perform any defective work and shall re-perform the necessary services including providing the crew and the equipment required for such repair or re-performance. If Contractor refuses or fails to comply with the provisions of this Article by the earlier of (a) with respect to any emergency or period in which a wind turbine is not operational, two (2) days after such emergency or period and (b) ten (10) days after receiving written notice from MOUNTAIN CRANE detailing such failure, MOUNTAIN CRANE is hereby authorized to take all steps necessary to carry out the same and may charge to Contractor the expense thereof, which MOUNTAIN CRANE shall, acting in good faith, minimize to the fullest extent, and which expense Contractor hereby agrees to pay.

11) **Liens and Claims.** Notwithstanding anything to the contrary in this provision, Contractor shall take such action and execute such documents as as are required for MOUNTAIN CRANE to comply with its own lien waiver and discharge of lien obligations as to Owner as set forth in the Prime Contract Documents. Thus, if any provision in the Prime Contract has conflicting terms, or requires more stringent obligations, for MOUNTAIN CRANE in favor of Owner, Contractor shall also comply with such terms and conditions to the same extent required of MOUNTAIN CRANE (including compelling or obligating any subcontractors to such requirements). Subject to the foregoing, if MOUNTAIN CRANE has paid Contractor in accordance with the requirements of this agreement, Contractor shall within seven days, satisfy and discharge and shall indemnify, defend and hold harmless MOUNTAIN CRANE and Owner

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

against any liens, claims, demands or legal proceedings arising out of, incidental to or in relation to this Agreement or their performance thereof and for the Services performed or for materials or fuel furnished hereunder. If a lien is filed in respect to the services or work performed by its Contractor's subcontractors and/or suppliers, Contractor shall, at its own expense, within seven days take such action as is necessary to remove or satisfy the lien, claim, demand or legal proceeding. If Contractor fails to comply with the foregoing in a timely manner, MOUNTAIN CRANE may do so and charge Contractor with all expenses incurred. All funds paid or expenses incurred by MOUNTAIN CRANE arising out of or relating to Contractor's failure to comply with this article, can and shall be deducted from any future payments owed by MOUNTAIN CRANE to Contractor pursuant to this Agreement, or if no future payments are due, shall be reimbursed by Contractor to MOUNTAIN CRANE.

12) **Insurance.** Contractor agrees to obtain, pay for and maintain insurance for the type and amounts of coverage set forth in Prime Contract and below:

a.      Workers Compensation (or the equivalent) complying with the laws of the state of operation. Contractor will have the Worker's Compensation policy endorsed to waive subrogation against MOUNTAIN CRANE SERVICE, LLC and the parties noted in the prime contract;

b.      Employer's Liability insurance with limits of $2,000,000 each accident; $2,000,000 disease each employee, $2,000,000 disease policy limit.

c.      Commercial general liability insurance covering liability for injury, including death of persons, or damage to or loss of property, including without limitation, such liability as may arise from the use of independent contractors or contractual liability assumed under this contract. Coverage will include cross liability. Coverage should include sudden and accidental pollution liability coverage, otherwise a standalone pollution policy shall be maintained and evidenced. Said policy will include the following limits and be written on an occurrence form basis:

| | |
|---|---|
| General Aggregate Limit | $2,000,000 |
| (Other than products-completed operations) | |
| Products Completed Operations Aggregate Limit | $2,000,000 |
| Personal & Advertising Limit | $1,000,000 |
| Each Occurrence Limit | $1,000,000 |
| Fire Damage Limit | $   100,000 |
| Medical Expense Limit | $     5,000 |

d.      Comprehensive Automobile Liability with a comprehensive single limit of not less than $1,000,000 per occurrence. Coverage should include sudden and accidental pollution liability coverage. The Commercial Automobile Liability policy must contain an MCS-90 endorsement equal to the limit of liability of the policy;

e.      Property insurance with replacement cost coverage insuring MOUNTAIN CRANE's or its customer's property while in the care, custody and control of the Contractor whether as inventory housed in Contractor's facilities and/or while in the possession of the Contractor during transit and installation. Said policy will be written on an "all risks" basis including the perils of flood and earthquake; Limit of insurance shall be maintained as appropriate to cover all applicable property at any given time.

f.      Pollution Legal Liability Insurance of one million dollars ($1,000,000) per incident.

g.      Excess/Umbrella Liability insurance in an amount of $5,000,000 per occurrence.

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

h.      Professional Liability Errors and Omissions Insurance with $2,000,000 Limit.

Without limiting the foregoing, all insurance policies required pursuant to this Section shall name Mountain Crane Service, LLC and the parties noted in the Prime Contract each as an additional insured by endorsement with respect to (c), (d), (e) (f) and (G) above. The Commercial General Liability policy shall specifically be endorsed using endorsement forms CG 20 10 07 04 and CG 20 37 07 04. A Waiver of subrogation endorsement naming Mountain Crane Service, LLC and the parties noted in the Prime Contract shall be provided with respect to (c), (d), (e) (f) and (G) above. The policies shall also provide that no cancellation or material modification of the policies will be made without thirty days (30) prior written notice to MOUNTAIN CRANE. The above policies shall contain applicable wording or be endorsed to be Primary and Non-contributory and will not seek contribution from any insurance or self-insurance maintained by MOUNTAIN CRANE. Contractor will provide MOUNTAIN CRANE certificates of insurance evidencing such insurance policies and endorsements. In the event of any failure of Contractor to comply with the provisions of the above, MOUNTAIN CRANE may, at its option, on notice to Contractor, suspend this Agreement until there is full compliance with the above, or terminate this Agreement. Notwithstanding anything in the foregoing to the contrary, to the extent that Owner requires additional insurance coverage, Contractor shall provide such insurance coverage within five (5) business days of receiving such request.

13)    **Termination.**

a)      Termination for Convenience:

Notwithstanding any contrary provision in this Agreement, MOUNTAIN CRANE may terminate this Agreement without cause, at any time, upon twenty-eight (28) days prior written notice or the minimum written notice required by statute, whichever is greater. Upon receipt of such notice, Contractor shall (a) immediately discontinue such Services, (b) place no further orders or subcontracts for materials, equipment, services, or facilities, (c) make every reasonable effort to obtain cancellation of affected subcontracts upon terms satisfactory to Mountain Crane, (d) provide Mountain Crane or Owner with the right, either by license or otherwise, to use any and all of Contractor's patented and/or proprietary information relative to the Facility and the Services, (e) accede to the request of Mountain Crane or Owner for assistance in the protection and disposition of materials, tools and Equipment relative to the Facility and the Services, and (f) comply with provisions of this Agreement which by their nature survive and shall remain in full force and effect after the date of such termination.

Subject to Owner's payment to MOUNTAIN CRANE, in the event of MOUNTAIN CRANE's termination for convenience, Mountain Crane shall pay to Contractor the following sums:

(i)      all amounts due and not previously paid to Contractor for Work performed in accordance with this Agreement prior to the receipt of notice by Contractor of termination and for such Work thereafter as Owner may request; and

(ii)     all costs reasonably incurred and fully documented by Contractor or subcontractors in obtaining cancellation of any subcontracts for Services so terminated.

Contractor shall not be entitled to compensation for Services it has not performed including, but not limited to, any lost profits on such unperformed Services. Further, it is expressly understood and agreed that nothing stated herein would obligate MOUNTAIN

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

CRANE to pay Contractor an aggregate amount in excess of the Agreement Price, including all payments previously made to Contractor pursuant to this Agreement.

b)     Termination for Cause:

MOUNTAIN CRANE may terminate this Agreement immediately in the event of the following:

(i)      Contractor is in default of any material provision of this Agreement and such default is not cured within fourteen (14) days of written notice thereof;

(ii)     filing of a voluntary petition in bankruptcy or liquidation by Contractor;

(iii)    adjudication as bankrupt against Contractor;

(iv)    filing of an involuntary petition to have Contractor declared bankrupt, unless such petition is set aside or withdrawn or ceases to be in effect within sixty (60) days from the date of filing;

(v)     appointment of a receiver or trustee for Contractor, unless such appointment is set aside or withdrawn or ceases to be in effect within sixty (60) days from the date of appointment;

(vi)    execution by Contractor of an assignment for the benefit of creditors under laws relating to bankruptcy, liquidation or insolvency;

(vii)   performance of Services in a manner unacceptable to MOUNTAIN CRANE;

(viii)  any material change in Contractor's business affecting Contractor's current or future obligations under this Agreement;

(ix)    unauthorized subcontracting of work;

Contractor hereby agrees to provide MOUNTAIN CRANE with prompt written notice of the occurrence of any of the above events; or

(x)     failure to fulfill Contractor's responsibilities and obligations set forth in Section 2 of this Agreement.

c)     Rights and Duties Upon Termination:

Upon termination of this Agreement for any reason:

(i)      Contractor shall immediately cease to represent itself as an MOUNTAIN CRANE service contractor and will discontinue the use of any identification or advertising that associates Contractor with MOUNTAIN CRANE;

(ii)     Contractor shall immediately return all promotional and training materials provided by MOUNTAIN CRANE hereunder;

(iii)    except as may be specifically provided for herein, MOUNTAIN CRANE shall not be liable to Contractor for any loss or damages sustained by reason of or resulting from entry into, performance under, or termination of this Agreement;

(iv)    Contractor shall, in good faith, take all reasonable steps to minimize termination costs;

(v)     the license granted to Contractor to use the Mark shall immediately terminate and revert to MOUNTAIN CRANE and Contractor shall retain no rights to the Mark; and

(vi)    Contractor shall, without delay and at its own expense, commence and timely complete all legal and administrative steps necessary to discontinue any further use the Mark and shall thereafter have a continuing obligation not to use the Mark or any mark or name of any type which is confusingly similar to any Mark.

Upon termination for cause by MOUNTAIN CRANE, Contractor shall immediately cease all Services that Contractor had begun to perform unless otherwise indicated in writing by MOUNTAIN CRANE. Subject to payment by Owner to MOUNTAIN CRANE for the same, Contractor shall be paid for any partially performed Services at a rate to be mutually agreed upon by MOUNTAIN CRANE and Contractor, except that Contractor shall reimburse MOUNTAIN CRANE for any costs and expenses incurred by MOUNTAIN CRANE in completion of Services partially performed by Contractor.

14)    **Compliance with Laws/Policies.** Contractor warrants, represents and agrees that it will comply with all applicable federal, state, and local laws, rules, regulations, ordinances and expressed public policies in connection with Contractor's performance under this Agreement. In addition, Contractor shall follow all MOUNTAIN CRANE Product Service policies and programs as may be furnished by MOUNTAIN CRANE to Contractor from time to time. Contractor, at its sole expense, shall secure any necessary permits, assignments, software licenses, or other rights that are required or reasonably necessary to properly perform the Services specified in this Agreement.

15)    **Policy Compliance; Drug-Free Work Environment: Background Check.** Contractor is required to have an effective drug and alcohol policy for its employees, agents, representatives and subcontractors to achieve a drug-free work environment (which includes the Facility and any other sites where Services are to be performed). Contractor shall also conduct background checks for its employees that will include criminal (felony and misdemeanor) records, social security number trace, education verification and employment verification for at least the two (2) most-recent positions of employment held.

16)    **Limitation of Liability.** MOUNTAIN CRANE SHALL NOT BE LIABLE FOR ANY LOSS, CLAIM, EXPENSE OR DAMAGE CAUSED BY, TO THE EXTENT CONTRIBUTED TO OR ARISING OUT OF THE ACTS OR OMISSIONS OF CONTRACTOR, CONTRACTOR'S EMPLOYEES OR TECHNICIANS, OWNER, OR THIRD PARTIES, WHETHER NEGLIGENT OR OTHERWISE. IN NO EVENT SHALL MOUNTAIN CRANE'S LIABILITY FOR ANY CAUSE OF ACTION WHATSOEVER EXCEED THE COST OF THE SERVICE GIVING RISE TO THE CLAIM, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY OR TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE. IN NO EVENT SHALL MOUNTAIN CRANE BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER SUCH INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUES, PROFITS OR OPPORTUNITIES), WHETHER ARISING OUT OF OR AS A RESULT OF BREACH OF CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE.

CONTRACTOR SHALL NOT BE LIABLE FOR ANY LOSS, CLAIM, EXPENSE OR DAMAGE CAUSED BY, TO THE EXTENT CONTRIBUTED TO OR ARISING OUT OF THE ACTS OR OMISSIONS OF MOUNTAIN CRANE, MOUNTAIN CRANE'S EMPLOYEES OR TECHNICIANS, OWNER, OR THIRD PARTIES, WHETHER NEGLIGENT OR OTHERWISE.

17)    **Notice.** All notices, requests and demands given or made upon the parties to this Agreement shall be in writing and shall be deemed given when delivered personally to the person named below, or if mailed, three (3) days after deposit in the United States Mail, postage prepaid, certified or registered mail, return

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

receipt requested, addressed to the parties as follows:

|  |  |
|---|---|
| To MOUNTAIN CRANE: | **Mountain Crane Service, LLC**<br>393 South 2650 West<br>Salt Lake City, UT 84104<br>Attention: Josh Chafin |
| To Contractor: | **Harvest Energy Services, Inc.**<br>111 Congress Ave., Suite 900<br>Austin, TX 78701<br>Attention: Cody Earle |

18)     **Documentation.** MOUNTAIN CRANE shall furnish to Contractor, at no additional charge, documentation related to the Prime Contract which has been provided to MOUNTAIN CRANE and which are applicable to Contractor's performance of the Services or compliance with the Prime Contract Documents. Contractor may, in preparation of its own support literature, reproduce any documentation provided by MOUNTAIN CRANE for such purpose, in whole or in part. All reproductions shall contain copyright notices in the form of the notices set forth on the original MOUNTAIN CRANE documentation. All documents provided by MOUNTAIN CRANE and all reproductions of such documents shall be treated as "Confidential Information" consistent with Section 8 of this Agreement.

19)     **Force Majeure.** Contractor shall comply with the Force Majeure provisions set forth in Article 5 of the Prime Contract, in all respects, as though Contractor is substituted for MOUNTAIN CRANE, and MOUNTAIN CRANE is substituted for Owner in the Prime Contract. For the avoidance of doubt, all obligations assumed by MOUNTAIN CRANE as to Owner in Article 5 of the Prime Contract are assumed by Contractor as to MOUNTAIN CRANE. Contractor shall not obtain any equitable adjustment or price or schedule unless MOUNTAIN CRANE obtains the same from Owner.

20)     **Severability.** In the event that any provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be illegal or unenforceable in any respect, the remaining terms and conditions of this Agreement shall be interpreted and enforced as though the illegal or unenforceable provision was not contained herein, unless such enforcement would yield a clearly inequitable result.

21)     **Third Party Beneficiary.** This Agreement is made solely for the benefit of MOUNTAIN CRANE and Contractor and their respective permitted successors and assigns and no other person or entity shall have or acquire any right by virtue of this Agreement.

22)     **Assignment/Delegation.** Contractor may not assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of MOUNTAIN CRANE, which consent may be withheld at MOUNTAIN CRANE's sole and absolute discretion. Despite such consent, no assignment shall release the assignor of any of its obligations or alter any of its primary obligations under the Agreement. Any attempted assignment or delegation in violation of this provision shall be void and shall entitle MOUNTAIN CRANE to terminate this Agreement. As used in this provision, "assignment" and "delegation" shall mean any sale, gift, pledge, hypothecation, encumbrance, or other transfer of all or any portion of the rights, obligations, or liabilities in or arising from this Agreement to any person or entity, whether by operation of law or otherwise, and regardless of the legal form of the transaction in which the attempted transfer occurs.

23)     **Governing Law.** This Agreement has been made in and shall be governed, interpreted and

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

enforced by the laws of the State of Utah.  MOUNTAIN CRANE and Contractor hereby irrevocably submit to the personal and subject matter jurisdiction of any state or federal court sitting in Salt Lake County, State of Utah, in any action or proceeding arising out of or relating to this Agreement.  **Each party acknowledges and agrees that any controversy that may arise under this Agreement, including any exhibits attached to this Agreement, is likely to involve complicated and difficult issues and, therefore, each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect to of any legal action arising out of or relating to this Agreement, or the transactions contemplated hereby.**

24)    **Non-solicitation.**  Neither party shall solicit, either directly or indirectly, or employ any employee of the other party during the term of this Agreement and for one (1) year after the last provision of Services. For the avoidance of doubt, a party is not prohibited from employing an individual who applies for a position in response to a posting, employment advertisement or other general solicitation of employment, whether such application is during the term of this Agreement or thereafter.

25)    **Survival.**  The provisions of this Agreement, which by their nature are intended to survive, shall survive completion, expiration, rescission or termination of this Agreement or acquisition or divestiture of Contractor.

26)    **Headings.**  Headings in this Agreement are for convenience only and shall not be used to interpret this Agreement.

27)    **Waiver.**  No waiver of any rights under this Agreement shall constitute a general or continuing waiver of that right or other rights under this Agreement.

28)    **Entire Agreement/Modification.**  This Agreement, including the exhibits and other documents referenced herein, constitutes the final and complete Agreement between the parties with respect to the subject matter herein and supersedes all prior or contemporaneous agreements, understandings, negotiations, discussions, offers and acceptances with respect to the subject matter herein.

29)    **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, estates, successors and permitted assigns.

30)    **Acceptance.**  This Agreement shall not be binding or of any force or effect unless it has been accepted and signed by the authorized representative of each party.  Each of the parties hereby warrants that the representatives signing on behalf of MOUNTAIN CRANE and Contractor have full authority to do so.  Upon execution of this Agreement by each of the parties hereto, this Agreement shall be valid and binding on MOUNTAIN CRANE and Contractor and enforceable in accordance with its terms.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed below by their duly authorized employees indicating acceptance of the terms and conditions herein.

**Mountain Crane Service, LLC**                    **[Harvest Energy Services, Inc.]**

By:    _Josh Chafin_                                 By: _____

Name: Josh Chafin                                    Name: ANDREW FOWLER

Title: CFO                                           Title: Sr Director Construction

Date: 11/9/2021                                      Date: Oct 27 2021

{00572634.DOCX / 7}

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

## EXHIBIT 1

### Scope of Work

Subject to the issuance of the Notice to Proceed or Limited Notice to Proceed by Owner, and in accordance with the terms and conditions of this Agreement and the Prime Contract Documents, Contractor will provide all services, labor, equipment, and materials necessary for electrically wiring WTG for the Project and inspect, assemble, and install the electrical scope of work of WTGs in accordance with the Requirements set forth in the Prime Contract Documents, including but not limited to:

o   Complete task as per the work instructions for the GE 3 MW platform technical documentation and the GE 1.79 technical documentation;

o   All down-tower wiring, termination and testing;

o   The connection of the cables to the main circuit breaker within the ground controllers of the WTGs;

o   The setting of Pad Mount Transformers at the applicable WTG locations onto existing poured and cured pads, in an orientation approved by Owner. No electrical connection or grounding is included;

o   The electrical installation completion of each WTG in accordance with the Requirements.

o   Procuring all the supplies, consumables, materials, tools and components (excluding the Wind Turbine Generators) necessary for its performance of the foregoing.

o   Completion of the "Grouting Procedures," as defined and detailed in the Prime Contract, for all Towers.

o   All base-bolt tensioning on Towers ("base-bolt tensioning" means and refers to the tightening of anchor bolts, which must be performed by Contractor in a manner consistent with the Prime Contract and its requirements).

It is understood and agreed that the Work includes all services and items that are specifically required by or reasonably inferable from this Agreement, whether or not such items and services are specifically mentioned herein, all to be in accordance with the Requirements. To provide the Contractor with guidance, the following scope clarifications are offered:

• Quantity of Units. The Project consists of six (6) GE 1.79 MW-100 Units on 80 m HH towers and twenty-three (23) GE 3.8 MW-137 Units on 81.5- m HH towers.

• Storage & Security. Upon Delivery of the WTG Components to the Site,

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

Contractor shall be responsible for providing appropriate material to secure the WTG Components, Specialty Tools, Installation Parts, and Padmount Transformers prior to installation. Contractor shall be solely responsible for safeguarding its tools, equipment and materials against theft or damage.

- Tower Grounding. Contractor shall be responsible for terminating the tower grounding.

- Trash Disposal. Contractor shall be responsible for properly disposing of any trash or debris resulting from the Work, in accordance with Applicable Laws and the Requirements. Scrap cable from the WTG equipment belongs to Owner. Owner will provide a container and Contractor will securely place all scrap cable in this container at the end of each day. The container shall be kept locked at all times.

- Landowner Provisions. Contractor shall comply with and be responsible for the Landowner Provisions and obligations identified in the Cattle Management Plan, as it relates to its Work.

- Site Environmental & Safety Orientation. All Contractor personnel and Subcontractors engaged in Work at the Site shall be obligated to undergo a Site Environmental and Safety Orientation sponsored by the Owner. No Contractor's employee or Subcontractor shall be allowed on the Site without first completing the Site Environmental and Safety Orientation. Contractor shall maintain a log of all personnel at the Site and ensure all personnel at Site undergo the Site Environmental and Safety Orientation. Contractor shall provide this log to Owner at any time upon Owner's request.

- Construction Water. Owner shall provide a water source in the Laydown Yard for Contractor's shared use with Others, and Owner shall be responsible for dust control.

- Inspections by Governmental Authorities. Surveys and/or inspections by Governmental Authorities or their third-party designees are recognized as inherent in work of the character provided for in this Agreement. Owner shall be responsible for coordinating and paying for all environmental and archeological surveys by Governmental Authorities, in accordance with the Contract Documents.

- Mitigation Measures. Contractor shall be responsible for implementing any mitigation measures required by Governmental Authorities, to the extent related to the Work.

- Padmount Transformers. Mountain Crane shall offload and stage all

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

Padmount Transformers related to the "GE 1.79 MW" units at the Laydown Yard, andtransport them to the WTG pads when applicable, and offload and set themonto their pads. Contractor may need to deliver and set the Padmount Transformers sooner or later than when it intends to complete WTGerection at the particular pad in order to accommodate the electrical contractor's schedule.

o

DocuSign Envelope ID: 888CE32F-2252-4A0D-BC66-7DAC81B1543F

## EXHIBIT 2

(Time and Materials Rates)

### Unit Rate Pricing

| | |
|---|---|
| Mob / Demob per tech | = $2,000 |
| T&M rate (hr/tech) | = $95 |
| T&M rate (hr/site manager) | = $120 |
| Tooling (weekly) | = $500 |
| Grout & Tensioning materials (per tower) | = 9,200 |