Matthew M. Boley (8536)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone:  (801) 363-4300
Facsimile:   (801) 363-4378
E-Mail:  mboley@ck.law
          jtrousdale@ck.law

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **MOUNTAIN CRANE SERVICE, LLC**, a Utah limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>**HARVEST ENERGY SERVICES, INC.**, a Colorado corporation, and **WORKRISE TECHNOLOGIES, INC.**, a Delaware corporation,<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Civil No. 2:22-cv-00178-HCN |
| **HARVEST ENERGY SERVICE, INC.**, a Colorado corporation,<br><br>Counterclaimant,<br><br>vs.<br><br>**MOUNTAIN CRANE SERVICE, LLC**, a Utah limited liability company,<br><br>Counterclaim Defendant. | **Honorable Howard C. Nielson, Jr.** |

Plaintiff Mountain Crane Service, LLC ("**Mountain Crane**" or "**Plaintiff**") hereby complains and alleges against Defendant Harvest Energy Services, Inc. ("**Harvest**") and WorkRise Technologies, Inc. ("**WorkRise**," and together with Harvest, "**Defendants**") as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Mountain Crane is a Utah limited liability company with its principal place of business in Salt Lake County, Utah.

2.      Harvest is a Colorado corporation with its principal place of business in Colorado.

3.      On information and belief, WorkRise is a Delaware corporation with its principal place of business in Austin, Texas.

4.      Harvest is a wholly-owned subsidiary of WorkRise.

5.      Upon information and belief, WorkRise controls some or all of Harvest's operations, including those relevant to this action.

6.      Upon information and belief, WorkRise funds some or all of Harvest's operations.

7.      Harvest operates under the WorkRise name and brand.

8.      Upon information and belief, Harvest utilizes WorkRise's employees in its operations and administration.

9.      Harvest entered into a "Subcontractor Agreement" with Mountain Crane (the "**Subcontractor Agreement**"), a copy of which is attached as <u>**Exhibit 1**</u>, which includes the following provision:

> This Agreement has been made in and shall be governed, interpreted and enforced by the laws of the State of Utah.  MOUNTAIN CRANE and [Harvest] hereby irrevocably submit to the personal and subject matter jurisdiction of any state or federal court sitting in Salt Lake County, State of Utah, in any action or proceeding arising out of or relating to this Agreement.  **Each party acknowledges and agrees that any controversy that may arise under this Agreement, including any exhibits attached to this Agreement, is likely to involve complicated and difficult issues and, therefore, each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect to of any legal action arising out of or relating to this Agreement, or the transactions contemplated hereby.**

10.     Upon information and belief, Defendants regularly conduct business in the State of Utah.

11.     Harvest is registered as a foreign corporation with the State of Utah, and has a registered agent located in the State of Utah.

12.     Defendants regularly communicated with Mountain Crane's officers and employees, who were located in the State of Utah.

13.     On at least one occasion, Defendants met at a location in the State of Utah to

discuss the Subcontractor Agreement.

14.     Based on the Subcontractor Agreement, the diversity of the parties, and the amounts at issue, Defendants are subject to the jurisdiction of the Federal Courts in the State of Utah as to the claims asserted in this action.

## FACTUAL ALLEGATIONS

I.     **The Agreements**

15.     On or about June 30, 2021, Mountain Crane entered into that certain *Wind Turbine Installation Agreement for Transportation, Offloading, Erection, Cabling and Mechanical Completion, dated June 30, 2021* (the "**Prime Contract**") with Strauss Wind, LLC ("**Owner**").

16.     Under the Prime Contract, Mountain Crane agreed to construct a wind energy generation facility consisting of twenty-nine (29) Units to be located in Santa Barbara County in the State of California ("**Project**" or the "**Facility**") on behalf of Owner.

17.     To fulfill its obligations under the Prime Contract, Mountain Crane sought a qualified, experienced, and capable subcontractor to perform electrical wiring, grout, and tensioning required for the "Wind Turbine Generators" ("**WTGs**" or individually, a "**WTG**") to be completed on the Project.

18.     In or around August, 2021, Mountain Crane and Harvest began negotiating the terms of a possible subcontract for Harvest to perform electrical work on the WTGs.

19.     Mountain Crane primarily communicated with Cody Earle ("**Mr. Earle**"), an employee of Defendants.

20.     Mr. Earle represented that he had the experience and expertise to perform the required wiring work for the WTGs, and that Defendants' team would work under his direction and control.

21.     Mountain Crane relied on Mr. Earle's representations regarding his experience and expertise in entering into negotiations with Defendants.

22.     In an email from Harvest to Mountain Crane sent on August 13, 2021, Harvest committed that "[t]imesheets will be filled out each day and signed as well as the Vestas MyTime app that Vestas requires for technicians to utilize."

23.     In response to the email sent by Harvest on August 13, 2021, Kortney King, ("**Ms. King**") a Mountain Crane employee, confirmed that "[w]e will need your timesheets and will be requesting Vestas sheets. This will ensure billing is mirrored between the two. Please note, we can only clear payment for what vestas sheets have been signed off for."

24.     Consistent with Ms. King's email to Harvest, in oral communications with Harvest, Mountain Crane alerted Harvest that it would be required to submit detailed timesheets and information for any billing on the Project.

25.     On or about October 1, 2021, Mr. Earle sent Harvest's "T&M Proposal to complete Down Tower Wiring and Grout & Tensioning" (the "**Proposal**") to Mountain Crane.

26.     After Harvest sent the Proposal, Mountain Crane and Harvest engaged in further negotiations via email and phone conferences.

27.     In their negotiations, the parties agreed that Harvest would be entitled to charge on a "Time and Materials" [1] basis for a limited duration of time, after which time, Harvest would charge on a "per tower completion" basis.

28.     Harvest requested that Mountain Crane issue a purchase order for the work and materials to be provided on a T&M basis.

29.     On October 4, 2021, Mr. Earle sent an email to Mountain Crane stating that "Mountain Crane will move forward with T&M pricing provided by Harvest for potentially 3 to 4 weeks for 4 technicians with a potential[] start date of 11 October" and requesting that Mountain Crane issue a Purchase Order ("**PO**") for the limited duration during which Harvest would work on a T&M basis.

---

[1] Hereinafter referred to as "**T&M**."

30.     On October 5, 2021, Mountain Crane issued Purchase Order # WDOW-92432 for $345,000, which was for all of the grouting and tensioning materials,[2] mobilization and demobilization, and T&M rates for labor and tooling for four (4) persons for four (4) weeks total.

31.     As reflected in Harvest's invoices for the weeks ending October 9, 2021 – November 12, 2021 (the "**T&M Period**"), Harvest utilized a crew and materials consistent with the PO issued by Mountain Crane.

32.     On or about November 9, 2021, Harvest and Mountain Crane entered into the Subcontractor Agreement.

33.     The Subcontractor Agreement provides that the "total compensation that [Harvest] may bill to MOUNTAIN CRANE for Services will be on a time and materials basis at the rates set forth in **Exhibit 2** or will change to a pre agreed per unit rate of $23,480 per completed WTG Unit, at a time to be agreed by both MOUNTAIN [CRANE] and [Harvest]."

34.     Mr. Earle, on behalf of Harvest, agreed that the T&M period was completed on November 12, 2021, and that Harvest's services would begin on a "per unit rate of $23,480 per completed WTG Unit" beginning on November 13, 2021.

35.     Pursuant to the Subcontractor Agreement, Harvest agreed to provide all services, labor, equipment, and materials necessary for electrically wiring WTGs for the Project and inspecting, assembling, and installing the electrical "Scope of Work" for the WTGs in accordance with the requirements of the Prime Contract, as well as all services labor, equipment, and materials necessary for "grouting" and "tensioning" the WTG Units.

36.     Harvest agreed to comply with the terms of the Subcontractor Agreement and the Scope of Work attached as Exhibit 1 thereto.

37.     Section 2 of the Subcontractor Agreement provides:

**Contractor's Responsibilities and Obligations.**  Contractor shall:

a)      maintain sufficient number of fully-trained technicians and employees to

---

[2] Mr. Earle informed Mountain Crane that Harvest would not be able to purchase the materials needed for the grouting and tensioning for the Project unless Mountain Crane paid for all of the materials (and only the materials) at the beginning of the Project.

perform the Services;

b)    accept and competently and timely perform Services in accordance with the Schedule provided in the Prime Contract, including all attachments, exhibits, addenda, amendments, change orders, documents incorporated by reference in, and appendices thereto (collectively, the "Prime Contract Documents"), notify MOUNTAIN CRANE of the nature of Services performed and complete any reporting requirements requested by MOUNTAIN CRANE;

c)    promptly deliver, furnish, install, and pay for all materials, labor, equipment, tools, appliances and any other items necessary for the complete execution of the Services in accordance with this Agreement and the Prime Contract Documents;

d)    secure and, upon request, provide MOUNTAIN CRANE with a copy of all federal, state and local legal and regulatory documentation, including, but not limited to, permits, hazardous material permits for transportation (including all appropriate placards for their vehicles), assignments, licenses, and approvals necessary and appropriate to perform the Services contemplated by this Agreement;

e)    comply with all applicable MOUNTAIN CRANE and Owner policies, including, but not limited to, those related to (i) safety; (ii) battery handling, transportation, storage and disposal; (iii) MOUNTAIN CRANE's requirement that Contractor's recycling process qualifies for an exemption from liability under the Superfund Recycling Equity Act (42 U.S.C. 9627, et al.); (iv) all immigration, personnel, cleanliness, coordination of work, insurance, and other similar requirements set forth in the Prime Contract;

f)    Contractor will assign a safety representative acceptable to MOUNTAIN CRANE.  Such representative may, , perform other duties.  Contractor's designated safety representative shall be physically located at the jobsite. Contractor's safety representative shall respond to MOUNTAIN CRANE's and Owner's safety concerns and requirements; have authority for correcting unsafe conditions or acts by Contractor, its employees, and employees of Contractor's suppliers or subcontractors of any tier; and coordinate with other jobsite contractors and subcontractors on safety matters required for the Work.  In performance of the Work under this Agreement, Contractor shall establish and maintain a Safety and Health Plan ("Safety and Health Plan") to include, if applicable, tower climbing and general construction policies.  The plan must be submitted to MOUNTAIN CRANE prior to Contractor's commencement of Services. If Contractor does not have a Safety and Health Plan, or if its existing Safety and Health Plan is not acceptable to MOUNTAIN CRANE for any reason, Contractor agrees to adopt the most stringent of MOUNTAIN CRANE's and Owner's safety policies and procedures.  Before beginning any work, Contractor shall assure all lower-tier subcontractors adopt in writing, the Contractor's written Safety and Health Plan.

g)      comply with all federal, state and local laws and regulations, including, but not limited to, all federal environmental regulations and standards with respect to the storage, transport, management or other activities associated with the recycling of products, parts and components, including, but not limited to, spent lead-acid batteries, capacitors and circuit boards; and

h)      complete any MOUNTAIN CRANE or Owner form upon request, and follow all MOUNTAIN CRANE service policies, procedures and programs and/or Owner's service policies, procedures and programs, including, but not limited to policies related to employment and background checks, drug testing and the production of a certificate of insurance, as may be implemented and furnished to Contractor by MOUNTAIN CRANE from time to time.

38.     Section 4 of the Subcontractor Agreement provides (with emphasis added):

**Contractor Bound by Terms of Prime Contract.**  Contractor agrees to be bound to the Owner and MOUNTAIN CRANE by all terms and conditions, technical and commercial, of the Prime Contract Documents and to conform to, and comply with their provisions and to **assume toward Mountain Crane all the obligations and responsibilities Mountain Crane assumes in and by the Prime Contract Documents toward the Owner** insofar as they are applicable to this Subcontract or Contractor's Services. Furthermore, except as otherwise provided herein or except to the extent that they are inconsistent with the terms set forth herein, MOUNTAIN CRANE agrees to be bound to the Contractor by all the terms and conditions, technical and commercial, of the Prime Contract Documents and to conform to, and comply with their provisions and to assume toward Contractor all the obligations and Responsibilities Owner assumes in and by the Prime Contractor Documents toward MOUNTAIN CRANE insofar as they are applicable to this Subcontract or Contractor's Services.  Where any provision of this Subcontract is inconsistent with any provision of the Prime Contract Documents, the more stringent provisions shall govern. Without limitation, Contractor agrees that Contractor shall: (i) not be entitled to any Change Order (*e.g.*, an amendment to the schedule by which the Services must be provided and completed, a change in the contract price, or any other equitable adjustment related to the Services), unless MOUNTAIN CRANE is entitled to and obtains a Change Order from Owner related to or affecting Contractor's Services; (ii) **be bound by any "dispute resolution" provisions in the Prime Contract Documents**; (iii) as applicable to Contractor's Services, acts, omissions, or performance or failure to perform under this Agreement, assume all of the indemnification requirements, responsibilities, and obligations that MOUNTAIN CRANE has assumed towards Owner; (iv) comply with any lien, lien waiver, or other similar such provisions in the Prime Contract Documents; assume all risks assumed by MOUNTAIN CRANE in the Prime Contract Documents, as such risks are applicable to Contractor's Services; and (v) comply with any Force Majeure provisions in the Prime Contract Documents, including the procedures by which to make a claim of Force Majeure.

39.     Section 16 of the Prime Contract provides:

A dispute may comprise one or more claims. If a dispute exists regarding a claim, the Parties shall endeavor to resolve their dispute through use of the following procedure:

(a) A meeting shall be held between the Parties, attended by individuals from Contractor and Owner with decision-making authority regarding the dispute, to attempt in good faith to negotiate resolution of the dispute.

(b) More than one meeting to negotiate resolution of the dispute may be held. However, if, within sixty (60) days after receipt of the non-claiming Party's decision, the Parties are not successful in resolving the dispute through discussion, then the Parties agree that the dispute may be resolved as provided in Section 18.4 below.

40.     Section 7 of the Subcontractor Agreement provides:

**Compensation to Contractor.**  The total compensation that Contractor may bill to MOUNTAIN CRANE for Services will be on a time and materials basis at the rates set forth in **Exhibit 2** or will change to a pre agreed per unit rate of $23,480 per completed WTG Unit, at a time to be agreed by both MOUNTAIN WIND and the Contractor. Invoices must include a detailed breakout of parts and labor.  Purchase order numbers, if applicable, must be clearly referenced on Contractor invoices. Contractor shall provide MOUNTAIN CRANE with documentation regarding Services performed and/or parts used in the performance of such Services ("Service Report") as MOUNTAIN CRANE may reasonably request prior to payment by MOUNTAIN CRANE. Notwithstanding anything herein to the contrary, Contractor must provide invoices to MOUNTAIN CRANE with sufficient detail, and in sufficient time, so that MOUNTAIN CRANE may comply with Owner's billing and payment requirements as set forth in the Prime Contract. Contractor invoices shall be paid by MOUNTAIN CRANE on payment terms of net thirty (30) days following the latter of (i) the date of receipt of the invoice and Service Report by MOUNTAIN CRANE or (ii) the date the Owner issues payment to MOUNTAIN CRANE in accordance with the Payment Schedule in the Prime Contract, and such payment relates in part or in whole to Contractor's Services. MOUNTAIN CRANE shall not pay for (i) Services for which no purchase order was issued by MOUNTAIN CRANE, (ii) Services that are not completed by Contractor, (iii) Services performed by unauthorized subcontractors, or (iv) Services for which Owner has not paid MOUNTAIN CRANE.  MOUNTAIN CRANE will not be responsible for payment of any invoice submitted more than twenty (20) days after Contractor completes Services, unless Owner pays MOUNTAIN CRANE for such Services, notwithstanding the dilatory invoice(s).

41.     The Subcontractor Agreement provides that Mountain Crane may terminate the Agreement immediately, for cause, if (among other occurrences): (i) Harvest performs the

Services in a manner unacceptable to Mountain Crane; (ii) Harvest experiences a "material change" in its business that affects its current or future obligations under the Agreement; or (iii) Harvest fails to fulfill its responsibilities and obligations set forth in Section 2 of the Agreement.

42.     Section 9 of the Subcontractor Agreement provides in relevant part:

**Indemnification.**     Contractor shall indemnify, release, defend and hold MOUNTAIN CRANE, Owner, and their directors, officers, employees, successors, assigns, customers and agents harmless from and against any and all claims, actions, demands, damages, liabilities, losses, costs or expenses, including reasonable attorney's fees, for (a) injury to or death of any person (including employees and agents of Owner or MOUNTAIN CRANE) and for loss of or damage to any and all property, arising out of or relating to Contractor's performance under this Agreement; or (b) any breach by Contractor of any obligation hereunder, any material misrepresentation or the non-performance of any covenant or obligation under this Agreement; or (c) any claims or actions arising out of, resulting from or connected with a claim of tortious interference and/or improper employment of any of Contractor's employees, including employees or technicians performing work hereunder; or (d) any claims made by Contractor or Technicians for injuries or damages made under worker's compensation or similar laws; or (e) any failure on the part of Contractor to comply with applicable federal, state and local laws, regulations and ordinances. Additionally, Contractor shall assume as to Mountain Crane the same indemnification requirements as Mountain Crane has assumed as to Owner in the Prime Contract Documents.

43.     Section 10 of the Subcontractor Agreement provides:

**Contractor Warranty.**  Contractor warrants as follows:

a)      that it is qualified to do business and is appropriately licensed to perform Services in any location specified in any executed Scope of Work.

b)      that Services improperly or incompletely performed, or parts which fail to perform, will be timely corrected at no cost or expense to MOUNTAIN CRANE or Owner.

c)      that all Services shall be performed by qualified personnel in a professional, timely and workmanlike manner and that Services will be of a quality which conforms to industry standards.

d)      that all Services will be performed in a manner that will comply with all laws, statutes, ordinances, regulations and expressed public policies of the

jurisdictions in which Contractor performs Services and that Contractor shall adhere to the highest ethical standards pertaining to the Services performed.

e)      that, during the 24-month period following the final acceptance of Contractor's Services (the "Warranty Period"), the Contractor's work and Services will (a) conform to technical requirements contained in the exhibits to, and as set forth in, this Agreement and the Prime Contract Documents, (b) be performed with reasonable skill and judgment in accordance with prudent wind power industry practices and (c) be free from defects in installation, assembly and workmanship (for avoidance of doubt, excluding normal wear and tear). Contractor further warrants that any material or equipment included in the Services will be new, unused and of the most suitable grade of its respective kind for its intended purpose. In the event any of the above warranties is breached, Contractor, at the option of MOUNTAIN CRANE and at no cost to MOUNTAIN CRANE,  shall for the Warranty  Period, be obligated at its expense to repair or re-perform any defective work and shall re-perform the necessary services including providing the crew and the equipment required for such repair or re-performance. If Contractor refuses or fails to comply with the provisions of this Article by the earlier of (a) with respect to any emergency or period in which a wind turbine is not operational, two (2) days after such emergency or period and (b) ten (10) days after receiving written notice from MOUNTAIN CRANE detailing such failure, MOUNTAIN CRANE is hereby authorized to take all steps necessary to carry out the same and may charge to Contractor the expense thereof, which MOUNTAIN CRANE shall, acting in good faith, minimize to the fullest extent, and which expense Contractor hereby agrees to pay.

44.     Section 13(c) of the Subcontractor Agreement provides:

Upon termination for cause by MOUNTAIN CRANE, [Harvest] shall immediately cease all Services that [Harvest] had begun to perform unless otherwise indicated in writing by MOUNTAIN CRANE.  Subject to payment by Owner to MOUNTAIN CRANE for the same, [Harvest] shall be paid for any partially performed Services at a rate to be mutually agreed upon by MOUNTAIN CRANE and [Harvest], except that [Harvest] shall reimburse MOUNTAIN CRANE for any costs and expenses incurred by MOUNTAIN CRANE in completion of Services partially performed by Contractor.

45.     Section 19 of the Subcontractor Agreement provides:

**Force Majeure.**  Contractor shall comply with the Force Majeure provisions set forth in Article 5 of the Prime Contract, in all respects, as though Contractor is substituted for MOUNTAIN CRANE, and MOUNTAIN CRANE is substituted for Owner in the Prime Contract. For the avoidance of doubt, all obligations assumed by MOUNTAIN CRANE as to Owner in Article 5 of the Prime Contract are assumed by Contractor as to MOUNTAIN CRANE. Contractor shall not obtain any equitable adjustment or price or schedule unless MOUNTAIN CRANE obtains the same from Owner.

## II.      Defendants' Breaches Under the Subcontractor Agreement

46.      Shortly after Harvest commenced work on the Project, Mountain Crane identified problems with Harvest's performance under the Subcontractor Agreement.

47.      On October 18, 2021, Mountain Crane discovered that necessary "Tension Heads" were not on the Project site, notwithstanding Harvest's agreement to provide them in accordance with the Project schedule. Mountain Crane notified Harvest of the problem via email and demanded that the delivery of the Tension Heads be expedited.

48.      On October 21, 2021, Mountain Crane discovered that Harvest had not yet provided required "Grouting Specifications" and an "SDS Sheet" for the materials needed for the WTG Tower base.

49.      Mountain Crane notified Harvest of its lack of performance via email and demanded that the "Grouting Specifications" and "SDS Sheet" be provided immediately.

50.      On October 21, 2021, Travis Horton, a Mountain Crane employee ("**Mr. Horton**") sent an email to Mr. Earle stating as follows (underlining included in original):

> *Good afternoon Cody,*
>
> *I just got word from the Rick Hansen at Strauss that Harvest does not have any representation with respect to experienced Grout Personnel.  We have completed setting our 1st Base Section and cannot proceed forward without the Grout Crew.  Please know, the Grout is on-site and we just obtained the SDS for the Grout late this morning from Austin.*
>
> *<u>Please expedite the Grout Crew immediately?</u>*
>
> *Next, I have also been informed that your Tension Heads are the incorrect size.  Rick Hansen may be able to shed some light on the correct size needed to perform that scope.*
>
> *Jeff and Rick, please feel free to add any detailed additional information that I may be missing.*
>
> *Any questions or additional information needed please utilize this thread to respond.*
>
> *Thank you everyone for working diligently to address these issues.*

*Keep it safe!*

51.    On October 27, 2021 Mountain Crane requested a conference call to "discuss the preparedness of your crew on the [Project]."

52.    During the October 27, 2021 conference call, which occurred the same day, Mountain Crane expressed several additional concerns with Harvest's (lack of) readiness to provide the agreed upon work and services under the PO.

53.    On November 12, 2021, Harvest notified Mountain Crane that it intended to begin wiring "WTG Tower E-02" on Saturday, November 13, 2021.

54.    Harvest, however, failed to provide the tooling certifications required to begin the wiring work on "WTG Tower E-02" on November 13, 2021. Accordingly, Harvest could not perform the work as it had promised.

55.    On November 13, 2021, Robb Hebble ("**Mr. Hebble**"), a Mountain Crane employee, sent an email to certain Harvest employees asking if Harvest had "all necessary Tooling and Manpower on site to facilitate your work scope starting on Monday, going forward?" and asked "[i]s there anything you need from Mountain to ensure [Harvest] is on time & prepared?"

56.    In response to Mr. Hebble's November 13, 2021 email, Harvest acknowledged that it did not have the tooling, certifications, or parts it needed for its scope of work (all of which it was obligated to furnish).

57.    On Monday, November 15, 2021, Harvest was (again) not in a position to begin the work it had promised to begin. That morning, at 9:00 a.m., Jeff Sterett ("**Mr. Sterett**"), Mountain Crane's on-site Project supervisor, sent the following email to certain Harvest employees:

> *We need to discuss [the Project] again.  I understand not starting the tower wiring due to the yellow jackets this weekend on Saturday.  I am not understanding as to why we weren't able to start the Tensioning on Sunday after Grout breaks.  I am not happy with this especially when I had two days last week where we had one person on site for morning meeting from Work Rise.  If we [ ] as the customer are being charged standby time we have discussed the ability to use these guys for other task at hand and this is not the case if nobody is on site.  I*

*have also got feedback on the grout on the second tower poured as not being good at E-3.  I will get someone to get me pictures and a report back to this email today.  I am starting to have concerns and these need to start to be addressed by Work rise immediately.  We are going to start to get to tower wiring this week which should keep these guys busy but will start to raise more concerns.  To start I have some of the necessary tool certs but not all them to proceed with work.  This is starting to concern me as a trend and needs to be addressed again.*

58.     On November 15, 2021, at 12:56 p.m., Mr. Horton sent the following email to certain Harvest employees:

*Devon, Cody, Andrew, Court*

*Based on what we are seeing the WorkRise  performance needs to be corrected ASAP. Issues at hand.*
- *WorkRise not showing up to POD. WorkRise supervisor must attend all POD's!*
- *WorkRise crew not showing up for work every work day. If we are paying standby all employees must be onsite in the morning and check in with Mountain Site manager or we will not pay standby for that day.*
- *Necessary tooling not onsite. There has been plenty of time to get all necessary approved tooling onsite this must be rectified ASAP.*
- *Tooling certs not available. We need tooling certs before electrical work can commence.*
- *First tower toped out Friday 11/12/21 and wiring still not started. 100% of tooling certs not provided and no crew showed up.*
- *Tower E-3 grouted on Friday 11/12/21 grout brakes came back on 11/13/21 afternoon tensioning did not commence?*

*I have attached a schedule that must be met please make all necessary changes and arrangements to make this happen.[3]*

*We need to have a call tomorrow to discuss what your plan to make corrections and get on track to meet the schedule.*

59.     On December 10, 2021, Mr. Sterett notified Harvest that two of its key personnel, Austin Cullins ("**Mr. Cullins**") and Devon Desrochers ("**Mr. Derochers**"), were not on the Project site, and requested a "roll call" of Harvest's personnel onsite. Mountain Crane was informed that Mr. Cullins was "on rotation," and Harvest confirmed that Mr. Cullins would be back on the Project site the next day. Mr. Desrochers informed Mountain Crane that he had been delayed due to travel issues.

---

[3] The referenced schedule was attached to Mr. Horton's email.

60.     Also on December 10, Mr. Deroschers separately sent a series of text messages to Mr. Hebble. In relevant part, Mr. Deroschers asserted (emphasis added):

> [Mr. Cullins] should not have a job . . . [t]hat crew that's out there is all [Mr. Cullins'], I let him hire his own guys, Jesse is his main man. I've tried to swap them out for great proven guys [Mr. Cullins] has threatened to quit.
>
> Colton [Buskirk] is one of the best in the industry. I wanted Colton out there awhile ago, [Mr. Cullins] threatened to quit if I sent him. So I didn't, [and] let [Mr. Cullins] handle it. . . . The only reason [Mr. Cullins] has a job is cause we were told if [Mr. Cullins] leaves WorkRise is gone. Give me to end of next week and we are not so far up yalls ass you feel us in your throat, **_kick us off site_**. But don't hold the [Mr. Cullins] thing over me, let Colton run it. . . . **_Or just tell me to fuck off and kick us off site._** Cause I'm over [Mr. Cullins]. **_And I know Colton was suppose to be out there from the beginning. That's a dumbass decision made internally that all of them regret at this point._**

61.     On December 11, 2021, Mr. Cullins failed to appear at the Project site, and Mountain Crane subsequently learned that Mr. Cullins voluntarily terminated his employment with Defendants.

62.     On or about December 11 or 12, 2021, Mountain Crane hosted Harvest at "Mac's Place," in Salt Lake City, Utah, to discuss a multitude of issues with Harvest's Work on the Project (the "**SLC Meeting**"), including Harvest's failure to provide adequate tooling and personnel to perform the work required under the Subcontractor Agreement.

63.     At the SLC Meeting, Mountain Crane specifically addressed their concerns regarding the loss of Mr. Cullins, as he appeared to be the only individual employed by Defendants with the experience needed to complete the Project (though even his performance was severely lacking).

64.     At the SLC Meeting, Harvest informed Mountain Crane that Mr. Cullins had not, in fact, left his employment with Harvest, and ensured Mountain Crane that they had adequate personnel to complete the job.

65.     As of the date of the SLC Meeting, Mr. Cullins had, in fact, left his employment with Harvest.

66.     Subsequently, in or around the last week of December, 2021, Mountain Crane

learned that Mr. Earle had voluntarily left his employment with Defendants.

67.    Harvest failed to complete the WTG Units in the time set forth in the Project Schedule under the Prime Contract Documents.

68.    As described in more detail in Section IV, below, Harvest failed to properly and competently perform the Work and Services required under the Subcontractor Agreement.

69.    As described in more detail in Section IV, below, Harvest's Work and Services failed to comply with the technical requirements of the Prime Contract Documents.

**III.    Defendants' Billing Problems and Misrepresentations**

70.    Harvest also failed to comply with Mountain Crane's required billing procedures.

71.    Contrary to Harvest's agreement to "include a detailed breakout of parts and labor," including "documentation regarding Services performed and/or parts used in the performance of such Services . . . as Mountain Crane may reasonably request prior to payment by Mountain Crane," Harvest did not provide invoices that included a detailed breakout of parts and labor.

72.    On January 4, 2022, Ms. King, sent an email to Harvest stating as follows:

*Workrise/Harvest Team,*

*We received multiple invoices for the Strauss Project however have not received any signed worksheets for your team onsite that correlated to the invoices received. Please send those my way as soon as possible. I also ask that moving forward those also attached to any invoices sent to our AP team. Let me know if you have any questions or concerns.*

73.    Ms. King's January 4, 2022 email was a reiteration of her requests in the August 13, 2021 emails to Harvest, wherein she stated that Mountain Crane required detailed timesheets for billing purposes.

74.    In response to Mountain Crane's request for detailed worksheets, Harvest sent payroll information, which did not include details of the tasks performed by Harvest's employees or the time spent performing them.

75.    On January 14, 2022, Dillon Flynn ("**Mr. Flynn**"), a Harvest employee, sent an

email to Ms. King with a sample "Construction Daily Report" that he indicated was filled out "every day via our time keeping platform," and which he agreed to provide to Ms. King

76. Harvest did not provide "Construction Daily Reports" as promised to Ms. King, despite multiple subsequent requests from Ms. King to Mr. Flynn to obtain the "Construction Daily Reports."

77. In late January, Harvest submitted multiple timesheets with the additional details requested by Mountain Crane (the "**Dilatory Timesheets**").

78. Upon information and belief, the Dilatory Timesheets were not contemporaneously recorded records, but instead were "best guesses" created by Defendants' management to comply with the requirements of the Subcontractor Agreement.

79. Upon information and belief, the Dilatory Timesheets do not accurately represent the tasks performed by Harvest's employees or the time actually spent performing them.

80. Harvest did not comply with the requirements of Section 7 of the Subcontractor Agreement.

81. Because of Harvest's failure to comply with Section 7 of the Subcontractor Agreement, Mountain Crane was unable to "comply with Owner's billing and payment requirements as set forth in the Prime Contract."

82. Because of Harvest's failure to comply with Section 7 of the Subcontractor Agreement, Mountain Crane was not timely paid by Owner.

## IV. Termination for Cause and Further Breaches by Defendants

83. On or about January 21, 2022, Mountain Crane terminated Harvest "for cause," effective immediately (the "**Termination Date**").

84. Prior to the Termination Date, Harvest represented to Mountain Crane that it had completed wiring and all other requirements under its Scope of Work for five (5) of the WTG Units (the "**Five Haphazard WTG Units**").

85. Following the Termination Date, Mountain Crane engaged Sentry Electrical Group, Inc. ("**Sentry**") to inspect the Five Haphazard WTG Units.

86.     Sentry represented to Mountain Crane that the Five Haphazard WTG Units would require a complete "rewiring" due to Harvest's failure to properly wire the Five Haphazard WTG Units.

87.     Sentry's representations to Mountain Crane subsequently were confirmed by GE Renewables North America, LLC ("**GE**"), the company that supplies the components for the WTG Units.

88.     Under Section 10.1 of the Prime Contract, GE was required to complete a "mechanical completion checklist" and a "turbine mechanical completion certificate" in order for a WTG Unit to achieve "Mechanical Completion."

89.     Due to Defendant's defective writing and work on the Five Haphazard WTG Units, GE indicated to Mountain Crane that Mountain Crane needed to order replacement parts and materials totaling $76,067.10 (or $15,213.42 per WTG Unit) (the "**Replacement Materials**"), and have the Replacement Materials correctly installed, before GE could complete a "mechanical completion checklist" and a "turbine mechanical completion certificate" for any of the Five Haphazard WTG Unit.

90.     Harvest failed to properly wire the Five Haphazard WTG Units.

91.     Without limitation, Sentry' corrective work for the Five Haphazard WTG Units includes (or will include) tearing out significant portions of the wiring that Harvest claimed to have completed.

92.     Sentry has quoted to Mountain Crane an estimated cost of $47,800 per WTG Unit (an amount that includes the costs of the Replacement Materials) to correct and complete the Five Haphazard WTG Units.

93.     In addition to the costs to complete the Five Haphazard WTG Units, Sentry has also quoted Mountain Crane an estimated price of approximately $407,729.16 to complete the remaining Scope of Work (not including the Five Haphazard WTG Units) that Harvest had agreed to complete under the Subcontractor Agreement.

**V.     The Unlawful Stop Payment Notice**

94.     On or about January 26, 2022, Harvest issued a "California Stop Payment Notice" to Owner (the "**Stop Payment Notice**").

95.     The Stop Payment Notice alleges that Mountain Crane owes Harvest the amount of $635,345.00 (the "**Stop Payment Amount**").

96.     The Stop Payment Notice caused Owner to withhold the Stop Payment Amount from payments owed by Owner to Mountain Crane.

97.     By its terms, the Stop Payment Notice was issued pursuant to California Civil Code Sections 8500 – 8510 (the "**Stop Payment Code**").

98.     Section 8508 of the Stop Payment Code provides that a stop payment notice is not valid unless "[t]he claimant gave preliminary notice to the extent required by [Section 8200 of the California Civil Code]."

99.     Section 8200 of the California Civil Code provides in relevant part:

(a) Except as otherwise provided by statute, before recording a lien claim, giving a stop payment notice, or asserting a claim against a payment bond, a claimant shall give preliminary notice to the following persons:
    (1) The owner or reputed owner.
    (2) The direct contractor or reputed direct contractor to which the claimant provides work, either directly or through one or more subcontractors.
    (3) The construction lender or reputed construction lender, if any.

(b) The notice shall comply with the requirements of Chapter 2 (commencing with Section 8100) of Title 1.

(c) Compliance with this section is a necessary prerequisite to the validity of a lien claim or stop payment notice under this title.

(d) Compliance with this section or with Section 8612 is a necessary prerequisite to the validity of a claim against a payment bond under this title.

100.     On information and belief, Harvest did not provide a "preliminary notice" to Owner as required by Section 8200 of the California Civil Code.

101.     Harvest did not provide a preliminary notice to Mountain Crane prior to serving its Stop Payment Notice on Owner.

102.    Harvest did not provide proof that preliminary notice was provided to Mountain Crane or Owner.

103.    Section 8502 of the Stop Payment Code provides (emphasis added):

(a) A stop payment notice shall comply with the requirements of Chapter 2 (commencing with Section 8100) of Title 1, and shall be signed and verified by the claimant.

(b) The notice shall include a general description of work to be provided, and an estimate of the total amount in value of the work to be provided.

(c) The amount claimed in the notice **may include only the amount due the claimant for work provided through the date of the notice**.

104.    The Stop Payment Notice includes claims for invoices with due dates arising after January 26, 2022.

105.    As of January 26, 2022, Owner had not paid Mountain Crane for any of the amounts claimed by Harvest in the Stop Payment Notice.

106.    The Stop Payment Notice includes claims for amounts that were not due under the Subcontractor Agreement, in that Harvest agreed that payment on Harvest's invoices were on "payment terms of net thirty (30) days following the **latter** of (i) the date of receipt of the invoice and Service Report by Mountain Crane or (ii) the **date the Owner issues payment to Mountain Crane** in accordance with the Payment Schedule in the Prime Contract, and such payment relates in part or in whole to [Harvest's] Services."[4]

107.    The Stop Payment Notice includes claims for amounts that were not due under the Subcontractor Agreement, in that Harvest agreed that Mountain Crane was not obligated to pay for "Services for which Owner has not paid Mountain Crane."[5]

108.    Section 8204 of the California Civil Code states that if the preliminary notice is provided after the 20-day deadline, then the claimant is "entitled to record a lien, give a stop payment notice, and assert a claim against a payment bond **only for work performed within 20 days prior to the service of the preliminary notice**, and at any time thereafter." Cal. Civ. Code

---

[4] Subcontractor Agreement, § 7 (emphasis added).
[5] Subcontractor Agreement, § 7.

§ 8204 (emphasis added).

109.    Section 8504 of the Stop Payment Code provides (emphasis added):

**A claimant that willfully gives a false stop payment notice** or that willfully includes in the notice a demand to withhold for work that has not been provided **forfeits all right to participate in the distribution of the funds withheld** and all right to a lien under Chapter 4

110.    As described in more detail above, the Stop Payment Notice includes demands for Work and Services that were not actually provided or performed.

111.    The Stop Payment Notice includes demands for purported work that, if performed, would have been performed prior to 20 days prior to the Stop Payment Notice.

112.    The Stop Payment Notice is a "false" stop payment notice, in that it is not a valid stop payment notice under Sections 8502 or 8508 of the Stop Payment Code.

113.    Harvest willfully issued the Stop Payment Notice to Owner.

114.    Harvest issued the Stop Payment Notice without first complying with the dispute resolution procedures set forth in Section 4 of the Subcontractor Agreement and Section 16 of the Prime Contract.

**VI.    The Wrongful Lien**

115.    On or about February 18, 2022, the same day that this action was commenced, Harvest sent a letter to Owner titled: *Affidavit for Mechanic's Lien Recorded in Santa Barbara County, California Strauss Wind Farm, 4700 San Miguelito Rd., Lompoc CA 93426 (the "Property")* (the "**Dilatory Preliminary Notice**").

116.    Harvest had not performed any work on the Project in the twenty days preceding the date of the Dilatory Preliminary Notice.

117.    The Dilatory Preliminary Notice includes a *Proof of Service Declaration (on Owner) California Civil Code § 8146(a)(7) and (c)(1)* (the "**Proof of Service**") indicating that service of the Dilatory Preliminary Notice was sent by "registered mail, certified mail, or first-class mail" to Owner on February 18, 2022.

118.     On March 15, 2022, Harvest recorded a "Claim of Mechanics Lien" (the

"**Wrongful Lien**") with the Recorder's Office for Santa Barbara County, California.

119.     By its terms, the Wrongful Lien was recorded pursuant to California Civil Code

Sections 8400 *et seq.* (the "**Mechanic's Lien Code**").

120.     The Wrongful Lien is signed by "Kelsey Williams," with the title of "Associate

General Counsel."

121.     The Wrongful Lien asserts a claim in an amount no less than $697,912.50 (the

"**Wrongful Lien Amount**").

122.     The Wrongful Lien Amount includes amounts for work purportedly performed

prior to twenty days prior to the date of the Dilatory Preliminary Notice.

123.     On or about April 1, 2022, Mountain Crane obtained a *Release of Lien Bond* (the

"**Release Bond**") in the amount of $872,390.63, which equals 125% of the Wrongful Lien

Amount.

124.     Mountain Crane paid a total of $17,447.82 to purchase the Release Bond.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

125.     Mountain Crane incorporates the preceding allegations as if set forth herein.

126.     The Subcontractor Agreement is a contract by and between Mountain Crane and

Harvest.

127.     Under the Subcontractor Agreement, Harvest agreed to timely complete the Scope

of Work attached to the Subcontractor Agreement at a cost of $23,480 per WTG Unit, beginning

November 13, 2021.

128.     Harvest did not timely complete the Scope of Work at a cost of $23,480 per WTG

Unit.

129.     As of January 26, 2022 (the termination date), Harvest had not begun work on 18

of the WTG Units it was contracted to complete.

130.    As more particularly described above, Harvest materially breached Section 2 of Subcontractor Agreement by, among other things and without limitation:

    a.    Harvest did not maintain a sufficient number of fully-trained technicians and employees to perform the Services, including but not limited to its failure to retain (or adequately replace) Mr. Earle and Mr. Cullins and its failure to provide personnel with "grouting" experience;[6]

    b.    Harvest did not competently and timely perform the Services in accordance with the schedule provided in the Prime Contract Documents, in that it failed to properly complete the Five Haphazard WTG Units and it failed to commence work on the eighteen (18) remaining WTG Units in accordance with the Prime Contract Documents;[7]

    c.    Harvest did not complete the reporting requirements requested by Mountain Crane, including its failure to submit detailed "worksheets" on a contemporaneous basis;[8]

    d.    Harvest did not promptly deliver, furnish, install, and pay for all materials, labor, equipment, tools, appliances and any other items necessary for the complete execution of the Services in accordance with the Subcontractor Agreement and the Prime Contract Documents;[9]

    e.    Harvest did not timely secure and provide to Mountain Crane all permits, assignments, licenses, and approvals necessary and appropriate to perform the Services contemplated by the Subcontractor Agreement;[10]

    f.    Harvest did not complete any Mountain Crane form upon request, and did not follow all Mountain Crane service policies, procedures and programs and/or Owner's service policies, procedures and programs, including but

---

[6] See Subcontractor Agreement, §2(a).
[7] See Subcontractor Agreement, § 2(b).
[8] See Subcontractor Agreement, § 2(b).
[9] See Subcontractor Agreement, § 2(c).
[10] See Subcontractor Agreement, § 2(d).

not limited to Mountain Crane's policies regarding timesheets and billing;[11]

131.    Pursuant to Section 13(b)(x) of the Subcontractor Agreement, Harvest's failure to fulfill its responsibilities and obligations set forth in Section 2 of the Subcontractor Agreement constituted "cause" for immediate termination of the Subcontractor Agreement by Mountain Crane.

132.    As more particularly described above, Harvest failed to perform the Services in a professional, timely, or workmanlike manner (or in a manner acceptable to Mountain Crane), in that Harvest: (i) did competently perform the Services; (ii) did not timely perform the Services; (iii) did not complete the Services in a manner acceptable to Mountain Crane or Owner, in that the WTG Units require substantial rewiring and reconstruction to bring them into compliance with the Prime Contract Documents.

133.    Harvest's failure to perform the Services in a manner acceptable to Mountain Crane constituted "cause" for Mountain Crane immediately to terminate the Subcontractor Agreement under Section 13(b)(vii) of the Subcontractor Agreement.

134.    As more particularly described above, Harvest breached its warranty under Section 10 of the Subcontractor Agreement "that all Services shall be performed by qualified personnel in a professional, timely and workmanlike manner and that Services will be of a quality which conforms to industry standards."

135.    Harvest's failure to utilize and retain qualified personnel was cause for termination of the Subcontractor Agreement under Section 13(b)(viii), which provides that "any material change in Contractor's business affecting Contractor's current or future obligations under this Agreement" is cause for immediate termination.

---

[11] See Subcontractor Agreement, § 2(e).

136.     As described in more detail above, Harvest breached its agreement that Services improperly or incompletely performed, or parts which fail to perform, would be timely corrected by Harvest at no cost or expense to Mountain Crane or Owner.[12]

137.     Harvest agreed to reimburse Mountain Crane for any costs and expenses incurred by Mountain Crane in completion of Services "partially" performed by Harvest.

138.     Harvest agreed to indemnify Mountain Crane "from and against any and all claims, actions, demands, damages, liabilities, losses, costs or expenses, including reasonable attorney's fees. . . for loss of or damage to any and all property, arising out of or relating to [Harvest's] performance under this Agreement."[13]

139.     Without limitation, Harvest's actions have required Mountain Crane to obtain a new subcontractor to repair or replace Harvest's work on the Five Haphazard WTG Units, including tearing out significant portions of the wiring that Harvest claimed to have completed.

140.     Without limitation, Harvest's actions have required Mountain Crane to utilize its own personnel to perform the "grouting" and "tensioning" Work that Mountain Crane hired Harvest to perform.

141.      The estimated cost of hiring Sentry to repair and replace the wiring for the Five Haphazard WTG Units is approximately $47,800 per WTG Unit, totaling $239,000 (the "**Rewiring Costs**").

142.     The estimated cost for hiring Sentry to complete the remaining wiring for WTG Units that Harvest left uncompleted is $407,729.16 (the "**Wiring Completion Costs**").

143.     The estimated cost for utilizing its own personnel, equipment, and materials to perform grouting left uncompleted by Harvest is no less than $7,685.33 per WTG Unit, totaling no less than $138,355.94 (the "**Grouting Completion Costs**").

---

[12] See Subcontractor Agreement, § 10(b)
[13] See Subcontractor Agreement, § 9.

144.    The estimated cost for utilizing its own personnel to perform tensioning left uncompleted by Harvest is no less than $4,295.23 per WTG Unit, totaling no less than $77,314.14 (the "**Tensioning Completion Costs**").

145.    As a direct and proximate result of Defendant's wrongful conduct, Mountain Crane has suffered injury and damages in an amount to be proved at trial, but in no event less than $339,807.06 which represents the sum of the Rewiring Costs, the Wiring Completion Costs, the Grouting Completion Costs, the Tensioning Completion Costs, and the cost of the Release Bond, less the amount that Mountain Crane agreed to pay Harvest under the Subcontractor Agreement had Harvest successfully completed the Scope of Work. Additionally, Mountain Crane is entitled to an award of attorneys fees, costs, and expenses in an amount to be proved at trial.

146.    WHEREFORE, Mountain Crane has been damaged and is entitled to judgment against Harvest, in an amount to be proved at trial, but in no event less than actual damages of $339,807.06 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees, costs, and expenses.

## SECOND CAUSE OF ACTION

### (**Breach of the Implied Covenant of Good Faith and Fair Dealing**)

147.    Mountain Crane incorporates the preceding allegations as if set forth herein.

148.    An implied covenant of good faith and fair dealing inheres in each of the agreements between Mountain Crane, on the one hand, and Harvest, on the other hand.

149.    An implied covenant of good faith and fair dealing inheres in the Subcontractor Agreement.

150.    Harvest had a duty, without limitation, to refrain from taking any action to impede Mountain Crane's ability to receive the benefits for which it bargained under the Subcontractor Agreement, any other agreements between the parties, and Mountain Crane's Prime Contract with Owner.

151.    Harvest had a further duty, without limitation, to act in a manner consistent with the agreed common purpose of the parties to the Subcontractor Agreement, and with the justified expectations of Mountain Crane.

152.    Among other things, Harvest had a duty not to exercise discretion capriciously or in bad faith.

153.    As more particularly described above, Harvest materially breached its duties of good faith and fair dealing, in that: (i) Harvest submitted the unlawful Stop Payment Notice to Owner; (ii) Harvest recorded the Wrongful Lien; (iii) Harvest manufactured the Dilatory Timesheets knowing that they were inaccurate or were more likely than not to be inaccurate; and (iv) Harvest knowingly utilized unqualified and incompetent personnel for the Project due to internal "politics."

154.    Harvest's material breach of its duties of good faith and fair dealing materially injured and damaged Mountain Crane.

155.    Mountain Crane has suffered, and continues to suffer, both direct and consequential damages as a result of Harvest's breaches of the covenants of good faith and fair dealing.

156.    As a direct and proximate result of Defendant's wrongful conduct, Mountain Crane has suffered injury and damages in an amount to be proved at trial, but in no event less than $339,807.06, which represents the sum of the Rewiring Costs, the Wiring Completion Costs, the Grouting Completion Costs, the Tensioning Completion Costs, and the cost of the Release Bond, less the amount that Mountain Crane agreed to pay Harvest under the Subcontractor Agreement had Harvest successfully completed the Scope of Work. Additionally, Mountain Crane is entitled to an award of attorneys' fees, costs, and expenses in an amount to be proved at trial.

157.    WHEREFORE, Mountain Crane has been damaged and is entitled to judgment against Harvest, in an amount to be proved at trial, but in no event less than actual damages of

$339,807.06 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### (Declaratory and Injunctive Relief and Damages – Violation of the Stop Payment Code)

158.     Mountain Crane incorporates the preceding allegations as if set forth herein.

159.     Section 8508 of the Stop Payment Code provides that a stop payment notice is not valid unless "[t]he claimant gave preliminary notice to the extent required by [Section 8200 of the California Civil Code]."

160.     As described in more detail above, Harvest did not provide a "preliminary notice" to Owner as required by Section 8200 of the California Civil Code.

161.     As described in more detail above, the Stop Payment Amount includes amounts for work purportedly performed prior to twenty days prior to the date of any preliminary notice, to the extent that any preliminary notice exists.

162.     As described in more detail above, Harvest agreed that it was **not** entitled to be paid by Mountain Crane for Harvest's Services unless and until Owner first paid Mountain Crane for Harvest's Services.

163.     As described in more detail above, as of the date of the Stop Payment Notice, Owner had not paid Mountain Crane any amount for Harvest's (dilatory and unsatisfactory) Services.

164.     Harvest issued the Stop Payment Notice without first complying with the dispute resolution procedures set forth in Section 4 of the Subcontractor Agreement and Section 16 of the Prime Contract.

165.     As described in more detail above, Mountain Crane did not owe Harvest any payments as of the date of the Stop Payment Notice.

166.     The Stop Payment Notice violates Section 8502 of the Stop Payment Code.

167.     As described in more detail above, the Stop Payment Notice includes demands for payment for Work and Services that Harvest did not actually perform.

168.     As described in more detail above, the Stop Payment Notice includes demands for payment for Work and Services that Harvest did not satisfactorily or competently perform.

169.     Harvest willfully issued the Stop Payment Notice to Owner.

170.     Harvest included amounts in the Stop Payment Notice that it knew it could not lawfully claim.

171.     The Stop Payment Notice is a false stop payment notice pursuant to Section 8504 of the Stop Payment Code.

172.     The Stop Payment Notice includes a demand to withhold for work that had not been provided, in violation of Section 8504 of the Stop Payment Code.

173.     Based on its violation of Section 8504 of the Stop Payment Code, Harvest has forfeited its right to participate in any distribution of the Stop Payment Funds and any right to file a mechanic's lien under the Mechanic's Lien Code.

174.     WHEREFORE, Mountain Crane has been damaged and is entitled to judgment against Harvest declaring that Harvest is in violation of the Stop Payment Code, enjoining Harvest from taking any action to enforce the Stop Payment Notice, finding that Harvest is not entitled to be paid any amounts so claimed pursuant to Section 8504 of the Stop Payment Code, and awarding damages to Mountain Crane in an amount at least as much as Mountain Crane's actual costs, damages, and attorneys' fees, pursuant to Section 8558 of the Stop Payment Code.

**FOURTH CAUSE OF ACTION**

**(Declaratory and Injunctive Relief and Damages –**

**Violation of California Mechanic's Lien Statute)**

175.     Mountain Crane incorporates the preceding allegations as if set forth herein.

176.     Section 8510 of the Mechanic's Lien Code provides that "[a] claimant may enforce a lien only if the claimant has given preliminary notice to the extent required by [Cal Civ. Code 8200 *et seq.*] and made proof of notice."

177.     Cal. Civ. Code § 8204(a) provides:

(a) A preliminary notice shall be given not later than 20 days after the claimant has first furnished work on the work of improvement. If work has been provided by a claimant who did not give a preliminary notice, that claimant shall not be precluded from giving a preliminary notice at any time thereafter. The claimant shall, however, be entitled to record a lien, give a stop payment notice, and assert a claim against a payment bond only for work performed within 20 days prior to the service of the preliminary notice, and at any time thereafter.

178.     The Dilatory Preliminary Notice was sent to Owner no sooner than February 18, 2022.

179.     To the extent that Harvest performed work or services on the Project, Harvest performed such work or services no later than January 21, 2022.

180.     The Wrongful Lien Amount consists entirely of amounts for work purportedly performed prior to twenty days prior to the date of the Dilatory Preliminary Notice.

181.     Section 8430(a) of the Mechanic's Lien Code provides:

(a) The lien is a direct lien for the lesser of the following amounts:
    (1) The reasonable value of the work provided by claimant.
    (2) The price agreed to by the claimant and the person that contracted for the work.

182.     The Wrongful Lien Amount exceeds the reasonable value of the work purportedly provided by Harvest.

183.     The Wrongful Lien Amount exceeds the price agreed to by Harvest and Mountain Crane under the Subcontractor Agreement.

184.     Harvest recorded the Wrongful Lien without first complying with the dispute resolution procedures set forth in Section 4 of the Subcontractor Agreement and Section 16 of the Prime Contract.

185.     As described in more detail above, Mountain Crane did not owe Harvest any payments as of the date of the recording of the Wrongful Lien.

186.     As described in more detail above, the Wrongful Lien Amount includes amounts for Work and Services that Harvest did not actually perform.

187.     As described in more detail above, the Wrongful Lien Amount includes amounts for Work and Services that Harvest did not satisfactorily or competently perform.

188.     As described in more detail above, due to its violation of Section 8504 of the Stop Payment Code, Harvest forfeited its right to record the Wrongful Lien.

189.     Harvest knowingly and willfully recorded the Wrongful Lien in an amount greater than any amount to which it was entitled to under the Mechanic's Lien Code.

190.     On information and belief, the Wrongful Lien was recorded with intent to defraud.

191.     The Wrongful Lien violates the Mechanic's Lien Code.

192.     As a result of the Wrongful Lien, Mountain Crane was forced to obtain the Release Bond pursuant to its Prime Contract with Owner.

193.     As a result of the Wrongful Lien, Owner has withheld amounts owed to Mountain Crane under the Prime Contract.

194.     WHEREFORE, Mountain Crane has been damaged and is entitled to judgment against Harvest declaring that Harvest is in violation of the Mechanic's Lien Code and finding that Harvest is not entitled to a mechanic's lien in any amounts so claimed pursuant to Sections 8422 and 8490 of the Mechanic's Lien Code, ordering Harvest immediately to release the Wrongful Lien, enjoining Harvest from taking any action to foreclose on the Wrongful Lien, and awarding reasonable attorneys' fees to Mountain Crane pursuant to Section 8488 of the Mechanic's Lien Code.

## **FIFTH CAUSE OF ACTION**

### **(Tortious Interference with Contract)**

195.     Mountain Crane incorporates the preceding allegations as if set forth herein.

196.     As described above, Harvest was aware that Mountain Crane was a party to the Prime Contract with Owner.

197.     The Prime Contract is a valid and lawful agreement between Mountain Crane and Owner.

198.    Harvest was aware that the issuance of the unlawful Stop Payment Notice would cause Owner to withhold payment from Mountain Crane to which Mountain Crane was lawfully entitled.

199.    Harvest intentionally and wrongfully issued the Stop Payment Notice to Owner.

200.    Harvest issued the Stop Payment Notice without justification.

201.    Harvest was aware that the recording of the Wrongful Lien would cause Owner to withhold payment from Mountain Crane to which Mountain Crane was lawfully entitled.

202.    Harvest intentionally and wrongfully recorded the Wrongful Lien in the Wrongful Lien Amount.

203.    Harvest recorded the Wrongful Lien in the Wrongful Lien Amount without justification.

204.    Harvest induced Owner to fail and refuse to perform Owner's obligations under the Prime Contract.

205.    Harvest acted with an improper purpose and by an improper means.

206.    As a result of Harvest's interference with Mountain Crane's contractual and business relations with Owner, Mountain Crane has been severely damaged and suffered, and will continue to suffer, irreparable harm and other damages, which include, without limitation, the lost time-value of the Stop Payment Amount and Wrongful Lien Amount being withheld from Mountain Crane, the cost of the Release Bond, and attorneys' fees and costs of litigation.

207.    Because Harvest's interference with Mountain Crane's contractual and business relations was willful, malicious, and in reckless disregard for the rights of Mountain Crane, Mountain Crane is entitled to an award of punitive damages, attorneys' fees, and costs in an amount to be determined at trial.

208.    WHEREFORE Harvest is liable to Mountain Crane in the amount of Mountain Crane's actual damages and punitive damages, in an amount to be determined at trial, including lost business and damage to its good will which, on information and belief, constitutes an amount so as to qualify for tier three discovery, plus the lost time-value of the Stop Payment

Amount and Wrongful Lien Amount, plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum.

## SIXTH CAUSE OF ACTION

### (Declaratory Judgment)

209.    Mountain Crane realleges and incorporates herein by this reference the foregoing paragraphs of the Complaint as if fully set forth herein.

210.    A justifiable controversy exists as to whether Harvest breached its Subcontractor Agreement with Mountain Crane.

211.    The parties' interests are adverse.

212.    Mountain Crane has a legally protected interest in its Subcontractor Agreement with Harvest and seeks to preserve that right through this declaratory judgment.

213.    These issues are ripe for the Court's determination.

214.    Accordingly, Mountain Crane seeks a declaratory judgment from this Court that its Subcontractor Agreement with Harvest is valid and enforceable and that Harvest materially breached the Subcontractor Agreement.

## SEVENTH CAUSE OF ACTION

### (Remedy – Alter Ego and/or Respondeat Superior)

215.    Mountain Crane realleges and incorporates herein by this reference the foregoing paragraphs of the Complaint as if fully set forth herein.

216.    Upon information and belief, Harvest is a wholly owned subsidiary of WorkRise.

217.    Upon information and belief, WorkRise funds Harvest's operations in whole or in part.

218.    Upon information and belief, Harvest and WorkRise share offices.

219.    Upon information and belief, the Defendants (Harvest and WorkRise) were, and are, one and the same.

220.    Upon information and belief, the Defendants (Harvest and WorkRise) were operated as a common enterprise.

221.    Upon information and belief, the Defendants (Harvest and WorkRise) commingled their assets, including cash and other property.

222.    Upon information and belief, the Defendants (Harvest and WorkRise) commingled their employees, officers and managers.

223.    Upon information and belief, the Defendants (Harvest and WorkRise) failed to observe corporate formalities.

224.    Upon information and belief, Harvest was not adequately capitalized.

225.    Upon information and belief, assets (including corporate funds) of Harvest were siphoned by and to the WorkRise.

226.    The Defendants (Harvest and WorkRise) had such a unity of interest and ownership that the separate identities of the Defendants (Harvest and WorkRise) do not exist, but the Harvest is, instead, the alter ego of Workrise.

227.    If observed, the corporate form would sanction a fraud, promote injustice, and result in an inequity.

228.    Plaintiff has suffered, and continues to suffer, injuries and hardships arising from and relating to the continued observance of the corporate form.

229.    Therefore, Defendant WorkRise is liable for the wrongful conduct of Defendant Harvest under the theory of "alter ego" or "veil piercing."

230.    In the alternative, on information and belief, Harvest was an agent acting under the direction, supervision, and control of Defendant WorkRise while it was acting subject to the Subcontractor Agreement.

231.    Defendant WorkRise utilized its general counsel to serve the unlawful Stop Payment Notice and to record the Wrongful Lien.

232.    Defendant WorkRise is therefore vicariously liable for the wrongful conduct of Defendant Harvest under the doctrine of *respondeat superior.*

233.    Therefore, Defendant WorkRise is liable for the damages to Mountain Crane described herein.

234.     WHEREFORE, Plaintiff is entitled to a judgment declaring and adjudging: (a) that WorkRise was, and is, the alter ego of Harvest; (b) that WorkRise is liable for all of the debts and obligations of Harvest (including Harvest's liabilities to Mountain Crane); and (c) that the assets of WorkRise shall be, and are, available to satisfy the creditors of Harvest.

WHEREFORE, Mountain Crane prays for relief as follows:

1.  on its first cause of action, for Breach of Contract, for a judgment against Harvest in an amount to be proved at trial, but in no event less than actual damages of $339,807.06 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees and costs;

2.  on its second cause of action, for Breach of the Implied Covenant of Good Faith and Fair Dealing, for a judgment against Harvest in an amount to be proved at trial, but in no event less than actual damages of $339,807.06 (as described above), plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum, plus reasonable attorneys' fees and costs;

3.  on its third cause of action, for Violation of the Stop Payment Code, judgment against Harvest declaring that Harvest is in violation of the Stop Payment Code, enjoining Harvest from taking any action to enforce the Stop Payment Notice, finding that Harvest is not entitled to be paid any amounts so claimed pursuant to Section 8504 of the Stop Payment Code, and awarding damages to Mountain Crane in an amount at least as much as Mountain Crane's actual costs, damages, and attorneys' fees, pursuant to Section 8558 of the Stop Payment Code;

4.  on its fourth cause of action, for Violation of the Mechanic's Lien Code, judgment against Harvest declaring that Harvest is in violation of the Mechanic's Lien Code and finding that Harvest is not entitled to a mechanic's lien in any amounts so claimed pursuant to Sections 8422 and 8490 of the Mechanic's Lien Code, ordering Harvest immediately to release the Wrongful Lien, enjoining Harvest from taking any

action to foreclose on the Wrongful Lien, and awarding reasonable attorneys' fees to Mountain Crane pursuant to Section 8488 of the Mechanic's Lien Code;

5. on its fifth cause of action, for Tortious Interference with Contract, judgment against Harvest in an amount to be proved at trial, but in no event less than actual damages and punitive damages, including lost business and damage to its good will which, on information and belief, constitutes an amount so as to qualify for tier three discovery, plus the lost time-value of the Stop Payment Amount and Wrongful Lien Amount, plus pre- and post-judgment interest thereon at the legal rate, *i.e.*, ten percent (10%) per annum;

6. on its sixth cause of action, for Declaratory Relief, a declaratory judgment from this Court that its Subcontractor Agreement with Harvest is valid and enforceable and that Harvest breached the Subcontractor Agreement;

7. on its seventh cause of action, for Alter Ego or Respondeat Superior, for a judgment finding that Harvest is the alter ego or agent of WorkRise, and finding WorkRise liable to Mountain Crane for all amounts for which Defendant Harvest is found liable hereunder; and

8. for such other relief as the Court deems just and equitable.

DATED: April 6, 2022

COHNE KINGHORN, P.C.

/s/ *Jeffrey Trousdale*
Matthew M. Boley
Jeffrey Trousdale
*Attorneys for* MOUNTAIN CRANE
SERVICE, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of April, 2022, I filed the foregoing **FIRST AMENDED COMPLAINT** with the Clerk of the Court by using the electronic filing system, which will send a notice of electronic filing to counsel of record in the above-captioned civil action.

/s/ Tresa Kosec